EXHIBITS FOR CASE

1:19-CV-01245- JD

A. **Interview with Clifford Gallant pages 01-015**
- **Admitted his client Granite State credit Union had been watching Ms. DelFuoco for a few years before post.**
- **Admits they lost in court a few months earlier for Ms. DelFuoco Explaining what was happening to her in her personal life and how the bank was playing a role in it. Tried to put a gag order on her. Case number  218-2016-CV-00060. Never changed his life style " wasn't losing sleep" not a true threat.**


B. **Interview with Jody Ducharme pages 001546-001558.**
- **Admits she has been watching me for a few years, (page001608) says there was a post but couldn't prove it. (page001610) On the stand said I was knowingly posting post to goad them... but I proved it was intended for psycho ex. She retracted. Also questioning two of same post if one that was whitening out was one used for grand jury? The trial one only said Psycho ex and even these two are not the ones in trial.**
- **Pages 001567,001600 this is questionable.**
- **The original post she down loaded 001565-001566. Compared to 000036 and 00042. They are different. Proving it was a single post with two comments, not three post as said.**
- **Again post 001563 is whiten out and I proved it was addressed to eric, she testified it was to her or someone at the bank.( look at comments)**
- **A surveillance picture of me, if I was such a threat why was I allowed to roam freely around to this credit union at all times. Page 000037**

Janet DelFuoco v. state of New Hampshire
1:19-cv-01245-JD

**C.  Emails between Tracey Healy and Clifford Gallant. Pages 000041,000044**

**D.  Interview with Mark weaver,  pages 000047 -000056 he stated in email he hadn't heard a case since 2015. That is false and he admits that in the interview, my youngest went into the United States Navy Sea Cadets with a future in the Navy and wanted to change his name. I asked for him to be removed form the case and he refused. (no real threat).**

- **He also left out in trial the reason I stormed out was because again my ex didn't follow procedure and I was hit with a story that was false about my son, he then proceeded to call me a " bad parent" in which he lied on the stand at trail and said never happened I have proof it did and Judge Howard acknowledged he had said it in his decisions. (said on record).**

- **Also said I was a threat because I quoted a movie. A movie, isn't that my right to watch a movie and express my opinion about it openly on face book?**

**E.  Interview with David Anderson pages 000743-000751. Says he saw me angry in January because of my ex husband. But goes on to say I never made statements of threats. ( not a true threat).**

- **Page 000761 email to security, doesn't believe its serous.**

**F.  Interview with Sandra peace, pages 000753-000760.**

Janet DelFuoco v. State of New Hampshire

1:19-CV-01245-JD

- During trial judge Howard moved to strike part of her testimony because Ms. Peace left out a very important statement. She had illegally sent me an email with a decision judge Anderson had made

    and I never saw it. It went into my junk mail. This action led to me not having due process to file an appeal with the supreme court of New Hampshire. She admitted that at trial.

G. Interview with Janet DelFuoco pages 001639-001655
    - Saying the truth, explaining everything that was going on and how it was about karma. Judge Howard agreed after hearing the taping of this interview, IT WAS NEVER A THREAT.

H. Pages 000457,000483. Proof I was suffering from all this I still have broken teeth and need caps. I also can provide the surgeons and counselors records from cancer removal surgery right before the trial, and how I had pneumonia during the trial. Also I had a slight nervous break down after the trial. The AG was more then aware of this.

I. This is the interesting part, one the discovery had no index, and two nothing went in order as you can see by the numbers.

    - Most important they used what I called double posted discovery to make it look like I had 2000 pages of evidence against me this goes on through out the whole discovery but I will spare the court and just give

Janet DelFuoco v. State of New Hampshire
1:19-cv-01245-JD

- a couple of examples, page000809,000854,000810,000855,000807,000853. This tactic was used to scare me and any attorney, plus used in court when lugging in four huge boxes of what they claimed to be evidence. ( did they do this with the grand jury also?
- During my trial Attorney Richard Liehman of concord NH, even said " your honor there is 2000 pages of discovery" if he actually looked at it he would have seen this was false, costing me $4,000 dollars to have him for a 15 minute hearing to get it dismissed. That was my life savings in case I need more surgeries in the future.

J. Pages 000938, a private conversation
  - 000954, a motocross picture
  - 00949, a pic of teenagers on a fire dept ladder from the fire explore program.
  - 000808, a pic from a time to put kids first.org
  - 000805, a meme, shared a million times throughout fb
  - 000804, a meme that is within the discovery a few times here again.
  - 000803, a meme
  - 000843, a picture of me and my sons
  - 000806, conversations, nothing to do with anyone
  - 000903, my date of birth.... Again a filler page to promote more then what was there.
  - 000978, another motocross picture. Both my sons were huge motocross racers, my youngest was a champion racer in Maine motocross series and in New Hampshire series, I was his mechanic and trainer.

**Janet DelFuoco v. State of New Hampshire**

**1:19-cv-01245-JD**

K. **Phone subpoena, my HOME PHONE, not cell phone**
  - **Pages 001534-001543**

    **Search warrants, page 000779-000785.  Illegal due to his opinion and not facts. On the stand he was asked three times if I was served and under oath said he wasn't sure.**

  - **Pages 001745-00149 Filed under seal another search warrant, again on his opinion and no facts or reason**

  - **Pages 001656- 001660, 001657, third paragraph down, he has no proof I said that and in my interview I never said that. My reference to the chief was because I have done instigative readings for him. I was just trying to prove I wasn't making it up that I was intuitive.**

# EXHIBIT "A"



## INTERVIEW TRANSCRIPTION

**INTERVIEWEE:**    **Clifford Gallant (by telephone)**

**INTERVIEWERS:**    **Investigator Richard C. Tracy, New Hampshire Attorney General's Office; and**

**Assistant Attorney General Lisa L. Wolford, New Hampshire Attorney General's Office**

**SUBJECT:**    **State v. Janet Delfuoco**

**MATTER ID #:**    **2017123748**

**DATE:**    **August 16, 2017**

**TIME:**    **2:05 P.M.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**RT:**    **Investigator Richard C. Tracy, New Hampshire Attorney General's Office**
**LW:**    **Assistant Attorney General Lisa L. Wolford, New Hampshire Attorney General's Office**
**CG:**    **Clifford Gallant**

RT:    Okay. It's August, 16, ah, 2017. It's about 2:05 P.M. I'm on the phone with, ah, Attorney Cliff Gallant from Manchester, New Hampshire. And, also with me is Assistant Attorney General Lisa Wolford. And, Attorney Gallant, could you just your name, and spell your last name for the record, please?

CG:    Ah, sure. Ah, Clifford P. Gallant, Jr. Ah, I'm with the firm of Beliveau, Fradette & Gallant here in Manchester. The address is 91 Bay Street. Ah, as I say, Manchester, New Hampshire.

1

RT:   Sir, you understand the, ah, conversation is being recorded?

CG:   I do

RT:   Okay. So, we just. I, I know that we have spoken in the past. And, ah, we just
      wanted to follow up with you on a few more details about the Janet Delfuoco
      matter, and, um, get it on record as we move forward here. So, if we could start
      by, maybe, you could just remind us and give us a brief overview of, ah, how you
      learned about, ah, this threatening messages posted by, ah, Janet, and what steps,
      if any, you took as a result of that.

CG:   Um, when you say, the messages from Ms. Delfuoco, I'm assuming that you're
      referring to a couple of Facebook posts that took place in early February of this
      year.

RT:   Ah, that's correct.

CG:   Um. As, ah, we've previously discussed, my firm is counsel to Granite State
      Credit Union. Um, and Ms. Delfuoco was a member of the Credit Union. And,
      um, the Credit Union periodically, I believe, monitor her Facebook account,
      because of some incident or incidents, um, that pre-dated my involvement with,
      ah, Ms. Delfuoco. Um, so, it's through that effort, um, that on or about. Ah, and
      it was actually a Sunday. I've got copies of e-mails here. February 5th. That I
      was furnished, ah, copies of a couple of e-mails. Ah, excuse me. Facebook posts
      by Ms. Delfuoco. Um. So, um, I'm of the understanding that your office is in
      possession of these Facebook posts. Um. So, after receiving those, ah, I
      happened to speak to, ah, one of my partners here in the office. Um, and as a
      result of that, ah, those, information about those posts, um, I believe, if my, my
      chronology is correct, with some, um, communicated, I believe, to the Court, ah,
      and eventually worked its way to being referred, I believe, to the Administrative
      Office of the Courts. Um. Hopefully, that answers your question. Maybe, a bit
      long-winded. But.

RT:   No. That's fine. Um. Ah, how about yourself, Sir? Obviously, you've read the
      Facebook posts. And, she appears to reference you in, in those messages. Did
      you have any concerns for what she had wrote, about your own safety?

CG:   Well, I, I don't want to be cavalier about it. I mean, certainly so. Um. I, I'm, ah,
      one of a number of attorneys. We have a staff here. Um, you, you certainly don't
      know what somebody could, or couldn't, do. So. Um. I, I. Ah. Ah, my office,
      or, ah, in particular, me. I, I had a bit of a, um. Of an experience, ah, ongoing
      experience with Ms. Delfuoco through litigation that was pending in the
      Rockingham County Superior Court. Which, you may, or may not, be aware of.

LW:   No. We're aware of it.

CG:   Um. Okay. So. And, it. In, in reviewing the record, um, or our files in advance
      of today's call, um, the dates of those posts seemed to come on the heels of, ah, an
      Order issued by the Rockingham County Superior Court on a Motion To Dismiss

that I had filed, um, in the second, ah, action that she brought against the Credit Union, which was rather lengthy. And, at that point, um, the Superior Court was on a, an electronic noticing system for non-confidential Orders. Um. I believe it began in November of 2016. And, the reason why I have a bit more command of these facts, is because Ms. Delfuoco, um, filed an untimely Notice of Appeal with the Supreme Court. Um. And, ah, that, that filing, I think, was as recent as, ah, just a couple of months ago. May or June. Um. And, so, in, in looking at that, um, aspect of our file, I was able to refresh, ah, refresh my recollection as far as the timeline, um, as it relates to those posts vis-à-vis, um, the dispositive motion of the Rockingham County Superior Court. Um. On that Motion To Dismiss. Forgive me a minute. But, I think. I'm trying to see. According to, um, a pleading that I had filed in the Superior. Ah, Supreme Court. Um, she had filed a Motion For Reconsideration. The Supreme Court apparently, initially, ah, denied, I believe, ah, rejected her Appeal, um, as being untimely. She filed a Motion For Reconsideration. I responded to that. I'm looking at my, my Objection to that Motion, which, ah, is dated June 7th. This, again, was in the Supreme Court. And, I remember touching base with the Rockingham County Superior Court as far as the timeline, as far as the noticing goes. And, ah. Pleading, I believe, indicates here. According to the records of the Rockingham County Superior Court, the following day, February 3, 2017 at 8:19, and again at 9:21 a.m., copies of the apposite Notice of Decision and Order were sent to Ms. Delfuoco via e-mail, the e-mail address set forth in her Complaint. So. Um.

LW:     Are you, are you? Ah.

CG:     So, what I'm trying to say to you guys is that it appears that these may have been prompted by. This is just a supposition. By the dispositive motion by the Superior Court dismissing her second, ah, dismissing her complaint was. Ah, it involved a claim against our client.

LW:     Yes.

CG:     Kind of seemed crazy.

LW:     Yeah. Um. Can I ask you? So, um, my recollection of, ah, the litigation between the Credit Union and Ms. Delfuoco is that it was initiated by the Credit Union in an attempt to enjoin her from defaming the Credit Union. Do you recall that?

CG:     Yeah.

LW:     Um, and do, do you, ah, recall, ah, the, the, the manner in which she was doing that was through Facebook posts in part?

CG:     Well, No. That. Ah, well, there may have been Facebook, book, book posts involved in that, too. But, there was also. She had gone on, um. Ah. I believe it was Mike Gills' radio show.

LW:     Yeah. Yeah.

3

6 →CG:   In addition to a, a show out of Nashua, I believe that was hosted by Kevin Avard, if memory serves me correctly.

LW:   Yeah. Yeah.

CG:   Um. I mean, we, we delineated. Ah, ah, it was. This was before she had sued the Credit Union. Um. She was, in, in the Credit Union's view, um, really engaging in making allegations about the Credit Union that just weren't true, and that were not favorable to its reputation. So.

LW:   Did?

7. →CG:   As a result, an effort was obtained to try to get some kind of a, um, ah, injunction to get her to stop it. And, ah, ah, after considering the pleadings, the Court denied that request for such relief. And, the Credit Union decided to, um, dismiss that suit.

LW:   Yeah. I'm familiar with the.

CG:   Okay.

LW:   Procedural.

CG:   Right. Okay.

LW:   History. Ah, ah, I just wondered if you. My, my notes indicate that, that the pleading, that I think you filed, had Facebook posts attached to it. Ah.

CG:   And, and it may. I mean, you've got to forgive me. I can certainly take a look.

LW:   No. No.

CG:   At that.

LW:   No, No, No. That's fine.

CG:   But.

LW:   That's fine, that's fine. If you don't have a, an independent recollection of it right now, that's, that's totally fine. 'Cause, ah, ah, ah, I'm assuming that. Ah, assuming, I'm right, um, if I showed that to you, that you would, ah, remember it.

CG:   Yeah. I mean, certainly that. I think that was a verified pleading, if I'm not mistaken. But.

LW:   I don't. What does that mean?

CG:   Well, I think it would have been signed under oath by a, by, by somebody with personal knowledge.

LW:   Hmm.

4

000004

CG:    Of the allegations in the complaint. I think.

LW:    Got you, got you.

CG:    I think.

LW:    Um, do you have a specific recollection about, ah, learn-, first learning about the Facebook, the, the posts that we're looking at, those, um?

CG:    Sure.

LW:    Okay. So.

CG:    The one that's February 5th.

LW:    Yeah, Yeah, Yeah.

CG:    Yeah.

LW:    Ah, and, ah, how did you? Did you get a phone call? Or, did you get an e-mail?

CG:    No. I got a call. Ah, Yes. I got a phone call. It was a Sunday afternoon.

LW:    Okay.

CG:    Mid-afternoon. I mean, it kind of surprised me. 'Cause, I don't get typically get phone calls, um.

LW:    Do you remember what you were doing?

CG:    It was either a phone call, or it might have been an e-mail on my phone. I think it was an e-mail on my. It was an e-mail, I believe.

LW:    Okay.

CG:    Um, that was forwarded to me by my client. And, I obviously have e-mail access to my, on my phone.

LW:    Okay. Um, do you remember what you were doing? Do you remember anything about the day?

CG:    I think I was coming back from the grocery store.

LW:    Okay. (Chuckles.) Um, and.

CG:    I was literally going up the steps from my garage to my home. Um, and I can remember my phone pinging, and looking at it. And, it was a response from one of the VP's over at the Credit Union.

LW:    And, and you recollection is that it had the content of the post?

CG:    Correct.

5

000005

LW:   And, do you, do you recall, then, did you have a, did you follow up with a phone call?  Or, was it just an exchange of e-mails?  If you don't remember, that's fine.

CG:   At, at that juncture, I believe that, ah, ah, I thanked her for it.  Ah, and I indicated I'd be following up in terms of what to do internally, the following morning.  Um. I actually got two of them.  Right.  There was one.

LW (to RT):  Is he talking to someone else?

CG:   I'm just looking at them.  There was one at, ah, 3:06, and another one at 3:12.

LW:   Oh, you're looking at the e-mails now?

CG:   Yup.

LW:   Oh, could you share those with us?  What?

CG:   Well, I'm, I'm assuming I can.  I mean, I, I. Ah, ah, I don't think there's anything in here of a confidential nature from my client.  But, you know, with that caveat. As far as a timeline.  Um, they were.

LW:   Yeah.  No.  We don't want anything confidential.

8   →CG:   Yeah.  Right.  Right.  So.  But, I mean, they just.  I mean, in a.  In a nutshell, they were, they were.  As I said, the Credit Union was, was monitoring her Facebook posts, because of those concerns.  And, so, they happened to be, um.  And, for a lack of a better phrase – noticed.  As a result of that effort.

LW:   Yeah.

CG:   And, so.

LW:   Yeah.

CG:   That person, who is my principal contact, immediately forwarded them to me to let me know about it.

LW:   And, um, ah, what?  Do you recall how you felt when you read them?  Dick asked you if you were concerned.  Can you, can you, can you sort of describe how you felt, what your reaction was?

CG:   Um.  I mean.  Ah.  I, I was.  I was.  Ah, it caused me pause.

LW:   Okay.

CG:   I mean, and I was, I was.  I was a bit concerned about it.  I'm not.  I mean, because, you know, where it's a small State.  Information is readily available. Ah, she certainly knew where my office was.  Ah, we have quite a staff here.  Ah, I mean, so, I, I don't want to, I don't want to take it lightly.

LW:   Yeah.

6

CG:   Ah, I, I certainly didn't. Um, which is the reason why we took the steps that we did. Um.

**9 →** LW:   So, fair to say, you probably weren't terrified?

**10 →** CG.   I mean, ah, I didn't, I didn't lose sleep.

LW:   Okay.

CG:   I mean, you know. But, I was concerned.

LW:   Okay.

CG:   Obviously concerned. And, ah, for both, you know, myself. Um, I, I certainly live here in the State of New Hampshire. Well, God only knows as to what she may, or may not, do. Um, and not to mention my office. So.

LW:   Yeah.

CG:   I, I don't want to say I was just, I was dismissing it. I, I, I, I really wasn't that.

LW:   No.

CG:   Um. You know, ah, ah, I've been practicing law for, for 30 years. And, my practice involves a fair amount of doing creditor work. And, so, um. You have folks who are in that situation, sometimes in difficult straits. And, they do or say things that they probably wish they didn't do or say.

LW:   Um, hmm.

CG:   Um. That having been said, this, kind of, goes far beyond that. Um, so. Plus, we had a bit of history with Ms. Delfuoco, as I said. So, um. So, this coming on its heels, it, kind of, went outside that box. Ah.

LW:   Got you.

CG:   To use a poor analogy. And, so, ah, it did cause me concern. Um. Because of the fact that it was certainly outside what I would call the norm of a, of, of a person who is upset with a, with a ruling, um, of a Court in a case that I was involved with.

LW:   And, sounds like, um, s-, s-, s-, some of your experience with her in litigation contributed to your concern. Is that a fair characterization?

CG:   Yes. Because, in open Court. I mean, she, she certainly had no. I mean, again, she's a pro se litigant. So. Ah, but she certainly had no. There were no filters. Um. There were no filters. She, she, she said what she wanted to say, irrespective as to the veracity or truthfulness of it. Um. And, so, so that certainly was, was, was cause for pause, and was disconcerting.

7

RT:    Mr. Gallant, ah, ah, you said you discussed this with one of your partners. Did
       you alert the rest of your office staff about Ms. Delfuoco, and her postings?

CG:    Phew. Ah. I had a conversation with Rick Fradette. We may have let, ah,
       everybody know about this. I, I'd have to double-check that one. I certainly. My
       secretary knew about it. Um. I. Hmm. I think my partner, Cheryl Beliveau,
       might have been on vacation at that point. Um. I mean, ah, ah. I want to say that
       we made that information known to the office fairly promptly. But, I'd, I'd need
       to triple-check that with Rick.

LW:    Could you do that?

CG:    Yeah.

LW:    Were there any other steps that you remember taking?

RT:    The. You know, um.

¹¹  ⟶CG:    I, I mean, to be candid with you. Because, ah, ah, the first thought was to notify
       the Manchester Police Department, I believe. Because, Rick is a, Rick is a
       longstanding resident of the City of Manchester. So, I think that's where it began.
       And, I think it ended up working its way, the way that I had summarized earlier
       on. That is, in terms of it, it went, um, and worked its way to the Courts. And,
       then, um, to obviously the Administrative Office of the Courts. Um, I don't know
       if. Ah, and, you know, correct me if I'm wrong, ah, Inspector Tracy. If you may
       have had some dialogue with the Manchester P.D., or not. I don't. For some
       reason, I think that may be true. But, I could be wrong about that.

¹²  ⟶RT:    Um. I don't know, in this, in this particular incident that I had any conversation
       with Manchester P.D. about this. I.

CG:    Okay.

RT:    I did speak with the Administrative Office of the Court.

CG:    Okay.

RT:    About it. But. Um, how about? Who from the Granite State Credit Union, ah, if
       you could, ah, tell us, who, ah, notified you on Sunday, the 5th of February?

CG:    That would be Tracy Heal-, Healey. I think I provided that information before, to
       be honest. But.

RT:    Yes. You did. Ah, and.

CG:    And, I think you may have reached out. Well, I don't know if you did, or didn't.
       But, I, I think you indicated that you would be.

RT:    No. We did. Ah.

CG:    Or, I thought you would be. So.

8

RT: Ah, we did. I just wanted to get it on record again. But, I also wanted to ask you, if you, if you recall how Tracy felt when she notified you about the, about the Facebook posts?

CG: Well, of course, it was by e-mail. Right. So. Um.

RT: So.

CG: Needless to say, there is a concern, because of the fact that her Facebook posts were being monitored. I mean, I can't, I can't get into the mindset of folks. But, I mean, ah, they were. Obviously, the Credit Union was concerned.

LW: Yeah.

RT: Okay.

CG: I mean, I can't. You know, they certainly didn't take it lightly. Um.

13 → LW: What about in your personal life? Ah, ah, ah, ah, were there any steps you took, um, to let people? I don't, I don't know if you live with anybody. But, did you, did you tell anybody about this? And, we're trying to just, sort of, gauge the level of your concerns.

14 → CG: [Sighs.] I, I, I probably told my wife.

LW: Okay.

15 CG: Um. Ah, because, it's out of, out of the ordinary. I probably told her. Um. I'd need to double-check that, too. But.

LW: (Chuckles.)

16 - CG: I've been married for 31 years. But, I, I. Ah, ah, I probably told her. I mean, I. Um. Yeah. I probably told her. And, ah, she would have reacted in such a way that, that she would be concerned. I, I, I believe I did that.

LW: Okay.

CG: Um.

LW: Any other?

CG: I mean, ah, ah, there's been instances of, years ago, where one of my partners, ah, had a, a marital case where somebody went off the handle. And, um, I believe a witness. This is 20 some-odd years ago. And, somebody, I believe, was killed.

LW: Oh, boy.

CG: So, we don't take those things lightly.

LW: Okay.

9

CG:    All right. So, so, now, I don't want to put this on that par. But, um, it was very. So, so, we're. We don't take these lightly. That's the point I'm trying to make.

LW:    Okay. Do you recall any other steps, or any other follow-up, um, with regard to the threats, and, and, you know, sort of, you're insuring your safety, or the safety of the people you live or work with?

CG:    I mean, ah. Ah. Once it was reported.

LW:    Um, hmm.

CG:    And, and was in the process of being, as we understood, investigated, the answer is No.

LW:    Okay.

CG:    Not to my knowledge.

LW:    Okay.

CG:    I don't know if Rick might have gotten a follow-up call, or, ah, or more from either the M.P.D. or the Administrative Office of the Courts. My. Maybe, before you got involved, Inspector Tracy. I, I seem to recall getting a call from the Administrative Office of the Courts, as well.

RT:    Ah, that potentially might have been a Jason Jordanhazy. Does that name sound familiar?

CG:    Well.

RT:    No?

CG:    I'd have to look.

RT:    Okay.

CG:    Um. Um. Yeah. Ah. Yeah. I mean. So, I guess the point I'm trying to convey to you folks is that the, the, the Manchester P., P.D. was contacted. It was communicated to the Courts. Um, a follow-up call was then received from the, ah, Administrative Office of the Courts. Um. Somebody, along the lines, made the, um. I believe, ah, searched in that. In addition to being concerned, in terms of the members of the Bench, ah, members of the Bar, too, that might have been within those, any such communications. So, I guess, speaking for myself, ah, I felt that what needed to be done was in motion. And, that.

LW:    Okay.

CG:    Um, persons who were beyond our office, would be looking at this, and making a determination as to how it should be handled. So, I.

LW:    Um, hmm.

10

CG:   Hopefully, you can appreciate what I'm trying to convey. But. Um, there were a number of persons, as a result of the extra steps we took, that we got contacted by. Ah, what comes to mind again is the Administrative Office, and then, you folks. Um. And, then, so, I think from that point, it. That's the extent of what was, I believe, done. Subject to my double-check with Rick to see if he got any further calls by anybody.

RT:   And, can you also, if you don't mind, would you be able to check and see if we could get a copy of the e-mails, ah, the notification from Tracy?

CG:   Yeah. Sure. Ah, I don't mind to be difficult. I just.

RT:   Ah.

CG:   Don't want to make that.

RT:   Yeah.

CG:   Decision on my own. I. I. You know, so. You have the posts, though? Right?

RT:   Yes.

CG:   Yeah. So, I. I'm assuming it would be fine for that. Yeah. So. I can. I can touch base. But, assuming that there isn't any. If we don't have any concerns, I'll, I'll, I'll do that. But, if we do, I'll be sure to ship that to, ah, Lisa.

LW:   Or, ah, to Dick.

CG:   Or, to Dick.

LW:   Yeah.

CG:   Okay.

RT:   Yeah.

LW:   Um, could I just ask you a follow-up question about your interactions, ah, or, at least, presence in Court when, when Ms. Delfuoco was in Court? Could you better describe your impressions of her? You said that she sort of said whatever she wanted. And, that was disconcerting. Ah, ah, ah, is? Are there other ways that you could describe her, her behavior, her conduct, her demeanor?

CG:   Um. Well, well. I, I truly can't. I mean, ah, she, um.

LW:   Was she calm, um?

CG:   Oh, No, No, No. No. To the contrary. I mean, there. There were probably. You could probably find. It may not be too audible. But, you could probably find on, on the Internet.

LW:   Yup. We have some of them.

000011

CG:   Okay. All right. Because, she would, in the last minute, would make requests for audio visual equipment to come in, so she could video those Hearings. Um.

LW:   But, but, but your impression is important to me.

CG:   Okay. Um. She was, um. She was extremely, um, outspoken. She, um, ah, was loud. Um. She.

LW:   Did she yell?

CG:   Certainly repeatedly asserted, um, that she thought, ah, my client was, ah, for lack of a better phrase, corrupt. Um. Um, she had made assertions about, um, follow-ups with your office, ah, supposedly in terms of. Your office and/or the Banking Department. Um. Making assertions about members of the Credit Union, and I believe with another office, that were not, ah, too favorable. Um.

LW:   You said she was not calm. Would you describe her as angry?

CG:   Yes. Yeah. She was. Not to have you put words in my mouth. But, she was, she was angry.

LW:   Can you?

CG:   She was, she was always angry.

LW:   And, you said she.

CG:   She was always angry. She was always animated. Um. Ah.

LW:   Did she seem reasonable?

CG:   Ah, No. No. I would not consider her to be reasonable.

LW:   In, in, in what way?

CG:   Um. Ah. Well, um. You know, for example. She had a, she had a, she had a, she had a piece of litigation involving her ex-husband. And, I suppose, you're aware of that, too

LW:   Yes.

CG:   Okay. So, um. There was, um. I'm trying to recall this. But, um. There was a Hearing of some type in that case. And, um, there was a Notice before that Hearing, issued by the Court, um, referencing Granite State Credit Union, and indicating that while Granite State was but a party. Um, and I'm paraphrasing that. Ah, ah, it would be welcome to appear. Or, they would. Something to that effect. Ah, it was read in such a way, that it may be helpful to the Court. So, so, the, the Credit Union made a decision to have, ah, a representative show up, along with me. Just to be in the Courtroom. Because, there was a lot of, ah, ah, back and forth going on in terms of the nature of that gentleman's obligation to the

12

Credit Union. Because, that was part and parcel of what gave rise to, um, the various claims that she was making, as it relates to the Credit Union.

LW: Right.

CG: And, so, you know, trying to be a good, for lack of a better phrase, corporate citizen, the Credit Union made that decision. And, um, and, so, ah, the Court saw that I was in the Courtroom. Ah, asked me to come up. And, ah, we were in the context, context of that Hearing. Ah, which involved in two pro se litigants. Both Mr. Goad and Ms. Delfuoco, ah, when. And, it's his ex-wife.

LW: Yes.

CG: Um. They were looking for certain information that Mr. Goad, I believe had indicated that, ah, it was okay for him to. That we could provide in limited basis. The point being that, um, Ms. Delfuoco, ah, went ahead and fired off some kind of a communication to us, looking for far more than what was the scope of what was discussed. And, she threatened that she would be, ah, looking to, um, make an issue out of it as to my client and to me. And, so, the point being that. The long way around, trying to convey to you that, despite everything that was going on, the Credit Union still wanted to do the right thing. And, it's almost like no good deed goes unpunished. And, um, um, that just didn't, ah, matter to Ms. Delfuoco. She just. It was just, um. She just had blinders on. And, no matter what, she was going to do anything and everything, and say anything to try to get what she believed was "justice". Quote, unquote. So.

LW: So, that's, that. So, I asked you if you, if you thought she was reasonable, or a reasonable.

CG: No. I don't think she's reasonable

LW: Yeah.

CG: That's. I'm trying to.

LW: So, that's the way.

CG: Illustrate that.

LW: Yup. So, that's, that's part of your observation.

CG: Yeah.

LW: So, you also had interactions with her. Ah, ah, was it just the one time, do you recall, ah, in her litigation against Mr. Goad?

CG: Are you? Ah, is your question, is that the only interaction that I had with her?

LW: No. I, I guess what. That. Yeah. It was a confusing question. You had interactions with her clearly in, in the scope of the litigation the Credit Union had

13

against her, and then her against the Credit Union. But, also, it sounds like, with regard to the litigation she had against her ex-husband.

CG: Um, hmm.

LW: You went to at least one Court Hearing.

CG: Um, hmm.

LW: Were you, were you involved in other proceedings?

CG: No.

LW: No. Okay.

CG: No.

LW: Okay.

CG: Not in that case.

LW: Do you have an estimate about how many times you were in Court with her?

RT: Ah, all total.

CG: Maybe 3. Maybe 4.

LW: Okay. Um, you said she was loud. Would, would she yell? Would she shout? Or, does she just speak loudly?

19 → CG: Well, No. I mean, it was more than just speaking loudly. I mean, she would be, um. She would. Well, No. She would. I mean. She, she. Shout. I mean. Ah. She certainly wasn't proper for the, in terms of the the, decorum of the Court. Um. You know, was she yelling and screaming? 'Cause, if you, if you say yelling and screaming, it seems to me that that's going to trigger a Court Officer. Um. And, and, and the Court, you know, saying, if you're not careful, you're going to be found in contempt. I would think. I mean, that, that never happened.

LW: That didn't happen. Okay.

CG: Um. And, and I think the Court, um. In fairness to it. I think, really tried to give her a great deal of leeway, um, in the challenging. This is just my observation. Ah, the challenge, the challenge of, of having a pro se litigant. Um. And, then, adding to it the, what I've just described, in terms of my perception of Ms. Delfuoco.

LW: Okay.

RT: Ah, Attorney Gallant, anything we didn't ask you, you think would be beneficial for us to know?

CG: Not that I can think of. Ah.

14

000014

RT: Well, we, we appreciate your time today. And, if you wouldn't mind, checking to see if we could get copies of those e-mails. And, also, check with your partner, Rick, ah, to see if he has any further recollection.

CG: Any recollection be. Well, certainly, he has a recollection. Ah, but, but you mean, in terms of beyond?

LW: Just the level of concern, and, and what steps might have been taken, once your firm was aware of the, um, of the posts.

CG: Okay. Sure.

LW: Just that limited issue.

CG: Okay.

RT: All right. We're going to shut this off.

ǂ

**29:11 (total length of tape)**

**END OF INTERVIEW**

**/ng**

**1802062**

# EXHIBIT "B"



# INTERVIEW TRANSCRIPTION

**INTERVIEWEE:**     Jody Ducharme [VIA TELEPHONE]

**INTERVIEWERS:**    Investigator Richard C. Tracy, New Hampshire Attorney General's Office; and

                     Assistant Attorney General Lisa L. Wolford, New Hampshire Attorney General's Office

**SUBJECT:**        State v. Janet Delfuoco

**MATTER ID #:**    2017123748

**DATE:**           February 9, 2017

**TIME:**           10:10 A.M.

*************************************

**RT:**   Investigator Richard C. Tracy, New Hampshire Attorney General's Office
**LW:**   Assistant Attorney General Lisa L. Wolford, New Hampshire Attorney General's Office
**JD:**   Jody Ducharme

**RT:**    This is Investigator Richard Tracy, ah, with the New Hampshire Attorney General's Office. It's, ah, February 9th, 2017. It is, ah, 10:10 A.M. I'm at the Office of the Attorney General. And, with me is Assistant Attorney General Lisa Wolford. And, on the phone with us is Jody Ducharme. Ah, Jody, you understand the conversation is being recorded?

**JD:**    Yes. I do.

**RT:**    And, you're okay with that?

**JD:**    Yes. I am.

**RT:**    Okay. If you don't mind, could you, ah, spell your last name for the record, please?

**JD:**    Oh, certainly. That's D-U-C-H-A-R-M-E.

001546

RT:   Okay. And, um, I have your, ah, phone number as 497-8593. Correct?

JD:   That's correct.

RT:   All right. And, Jody, you're, ah, presently employed with the Granite State, ah, Credit Union?

JD:   Yes. I'm the Marketing Manager at the credit union.

RT:   Okay. And, how long have you been there?

JD:   I have been with the credit union almost 12 years.

RT:   Okay. And, if you could, just briefly explain for us what your role is as the Marketing Manager.

JD:   Um, my role. I, I have oversight of all marketing. um, and public relations' capacities. So, basically, um, all types of advertising, um, events, charitable outreach. Um, one of the main components of my job is ensuring the credit union's reputation, and, um, how we present ourselves to the community at large.

RT:   Okay. And, if you could, explain to us how you, um, came to find yourself monitoring, or, or being involved in the matter involving a Janet Delfuoco.

JD:   Yes. Um. Well, ah, you know, the advent of social media, um, that is a double-edged sword, um, for marketers. Ah, it's, it's a great platform. But, it also is a platform that allows folks to, um, go on and post. And, and, so, with the credit union, with all of our social media channels, um, we do monitor what folks are putting out there, um, on our, on our pages, as well as, um, anything regarding Granite State Credit Union that is public. Um, Janet Delfuoco, um, kind of, came to light within the marketing area. I believe, it was in March of 2014. Our Nashua branch was robbed. Um, out on Facebook, the Telegraph had shared a link to, um, the story about the robbery. And, I was monitoring, um, comments on that story. And, folks were talking about different security, you know, issues and whatnot. But, she had put up a post at that point about that she was very happy it had happened. It couldn't have happened to a better credit, to, to a better credit union. Um, and, and, started, kind of, noting that she had some issues with Granite State Credit Union. Um, I, I may have a copy of her post at the office. I'm working remotely today. So, I, I'm, kind of, trying to recall back a few years ago, what exactly she put. But, it was, um. We deemed it very inappropriate, especially in regards to our staff, who, who were very frightened by that incident. Um, we, at that point, banned her from posting anything on, um, the credit union's Facebook page. We have that ability to do that if we feel like a post is inappropriate. Um, if for some reason, members are disclosing, ah, like, personal financial information that could lead, um, them to potential fraud. Ah, we try not to ever, um, ban or take down anybody's comments. Um, we believe in transparency, that have built our credibility. And, that we'd rather, um, you know, encourage folks to private messages, so we can address any of their issues.

2

LW:   So, the? May I just, um?

JD:   Sure.

LW:   Interrupt? So, the, the comments were posted not to the Telegraph, Nashua Telegraph, ah, website, but to, to the credit union's website?

JD:   To the credit union.

LW:   Okay.

JD:   And, to our Facebook.

LW:   To your Facebook. Got you.

JD:   Yeah. It was, that was made on our Facebook page. Someone had shared a link.

LW:   Got you.

JD:   To the Telegraph's, um, article about the robbery. And, she made the comment on our Facebook page, on that, on that link.

LW:   I see. Okay. And, and when you, when you ban somebody, do they know? Do you try to talk to them, or reach out to them first, or?

JD:   It, it depends on the nature of what their post is. Um, and, again, I can go through my files at work, and share that with you, um, when I'm back in the office. 'Cause, I, I don't. I'm trying. Ah, ah, this is all recollection.

LW:   Sure.

JD:   Ah, recollection right now. Um, I, ah, typically, if it's just someone complaining about service, or if they've had an issue at one of our branches, we private message them. And, we try to, um, take care of their needs, or address whatever the concern was. But, to do it in a private, um, setting. Just to ensure their, their financial security, as well. Um, her comments, though, were deemed, um, really aggressive. And, at that point, ah, when we block her, she's, I'm sure she's aware she's blocked. Because, she cannot. She does not have the ability. She can look at Granite State Credit Union's Facebook page. But, she does not have the ability to make any comment, or post anything on it, because she is a blocked user.

LW:   I see. Okay.

RT:   So, now, if we could come, ah, to. So, you block her from making comments on your Facebook. But, do you?

JD:   Right. And, at that point that I reached out to, um, ah, the executive team, and specifically, ah, to Tracey Healey who is the VP of, um, branch operations. And, she made me aware of, um, the ongoing situation at that point, where, apparently. And, I'm not as well versed in this. But, apparently, um, Janet had co-signed a loan for her ex-husband. There were issues with it. And, she was very unhappy

3

at that point with the credit union. I don't know if she had initiated litigation at that point against the credit union. Tracey could fill in the gaps there. But, at that point, um, I was made aware that she was a disgruntled member, that there were ongoing issues. And, so, you know, ah, as is. I don't single out any specific member, ever. But, if there is a, a member that had the potential to damage the credit union's reputation, I'm, I'm going to be monitoring on social media. Anything that they have made public.

RT:     Okay. And, is that about the time that you started, ah, monitoring, ah, Janet's Facebook page?

JD:     Yes.

RT:     Okay. So, other than what we just learned of recently, ah, this past weekend, are there any other postings that she's made that would be in the same context as what we now have in our possession from, ah, this past weekend?

JD:     Um, ah, to be honest with you, ah, ah, I. And, this is just my impression. But, um, it, it feels like as she has gone through this litigation process, and her. You know, ah, they've been. Ah, her case has been dismissed, um, in several different fashions. Um, she seems as though. It's, it's. Um, she's very troubled, obviously. And, she's getting more aggressive. Um, and that's been a little alarming. I was pretty concerned this weekend. I, I. And, you know, I, I don't know what her actions, what she would actually do, or not. But, that's when I immediately called Tracey, and, and, ah, wanted to share that. Over the, in the past, ah, couple years, she's put some stuff out on social media. She made. Ah, ah, one of the posts that comes to mind. She took photocopies of actual, um, some of the, I believe it was an equity loan that she had signed for her ex-husband. And, she put copies of her, um, financial documents on, on Facebook. Which puts her at risk. And, so, I was very concerned about that. Um, and I believe Tracey reached out, and said, you know, ah, Janet, that's, that's. You, you could, ah, potentially opening up yourself to fraud. Um, you know, someone capturing her social security number, or something like that. I mean, she's been relentless. Um, but, I haven't seen anything as aggressive or alarming as I did this past weekend.

RT:     Okay.

JD:     I mean, she put everything out on her Facebook page. Um, she's had issues with her family. I believe, she's alienated one of her children who doesn't have anything to do with her. And, she's just so open and public. I don't believe she has any privacy settings. Um, over the weekend, I also noted that she was, um, kind of, attacking her aunt and, and different family members. So, I mean, I think there's some concerns. Um, so, again, that's why, ah, I feel like, I feel like it has escalated, and it's become much more aggressive.

RT:     Ah, Jody, do you just, ah, periodically log onto her, you know, her Facebook name? Or, is, ah, do you get a, a warning of some type, should she make a post?

001549

JD:    Um, so, I, I don't have any, um, automatic notifications of a new post for Janet Delfuoco. I, however, get a notification if anyone, um, comments, or likes, or engages in, um, Granite State Credit Union's Facebook page, or, or other social media channels. That said, I do check in now, um, based on the, the nature of, of this whole situation with her. Um, I do monitor her several times a day. I've been jumping in, and checking, just to see what she's put out there.

LW:    Even before this, coming across this post this weekend?

JD:    Yeah. As, as the whole, ah, as the lawsuits and stuff have been going on, especially in the last year. A couple times a day, I do, I check her Facebook page to see what she's put out publicly. Just to see if there's anything I need to share with Tracey and our executive team.

RT:    So, walk us through, ah, this Sunday, um, if you.

JD:    Okay. Ah.

RT:    Recall the date and time, and, you know.

JD:    Ah, so, last Thursday, um, Tracey did let me know that the Judge had dismissed. Um, and I believe she had shared with you. There, there were, like, I think three items that the Judge had dismissed in the suit, that she was trying to counter-sue Granite State Credit Union. Um, so, Tracey said, just be, ah, be aware that this could incite her. And, and, and, so, I, I began monitoring her. And, I kept. And, I was, to be honest with you, I was very surprised, um, that Thursday went, Friday, Saturday, she had put nothing out there. Ah, Sunday.

LW:    Can I ask you whether, ah, do you recall whether she was active Thursday, Friday, Saturday on Facebook?

JD:    She was not active.

LW:    Okay. Meaning, you saw no posts to the?

JD:    Meaning, I saw no new posts. Um, I believe the last post I had seen from her, was put up Thursday afternoon, and this was in regards to, um, the New Hampshire Court system, when it came to deal with families.

LW:    Okay.

JD:    I know, she had, um, she had had some issues with the State of New Hampshire, as well.

LW:    Got you.

JD:    Um, so, I believe the last post I saw her put up, was Thursday. And, that was in terms of family, the family Court system in New Hampshire.

RT:    Okay.

5

LW:    Got you.

JD:    And, then.

RT:    Okay. So, now, help us out, ah, if you could, just describe where, where you are on Sunday. If you're at home. Or, you're out and about, and.

JD:    No. I, I actually, um, was at my Dad's house, um, doing his weekly pill fill. And, um.

LW:    (Chuckles.)

JD:    I, I was just, kind of, hanging out with him a little bit. And, I just, ah, I logged into Facebook really quick on my phone. And, I saw that, um, she initially had put up a post. Ah, I am not sure if Tracey had shared that one with you. But, it was pretty aggressive. Directed towards her aunt, who apparently had testified against, against her. That's what Janet had put in this post. Um, well, I, I, ah, I did a screen shot. And, I sent that out to the executive team and Tracey, just to make them aware. Um, and, then, within 15 minutes, um, she put a reply directly linked to that post, that that was the one that stated the two Judges, as well as, um, our attorney. That they were next. That she was coming for them.

LW:    So, she replied to her own post?

JD:    To her own post. Yeah.

LW:    I see. Ah, did anyone comment on the prior post?

JD:    No. It's in, you know, it's a very interesting comment. Because, um, ah, there's this whole group of individuals that, um, that have been super supportive of her. And, they always comment. And, it was interesting.

[sound of cell phone ringing]

JD:    That, um. Let me just hang that up. Sorry. Um, it was interesting that, I believe, I'm pulling it up right now. I believe, only one person had, um, commented. I think, people, I think, people. And, again, that's my interpretation. But, I believe, people may have, um, kind of, stepped back, and realized that she was getting a little aggressive. It looks like now, she's taken that post down. So, I was trying to pull it up for reference.

RT:    Yeah. I, I checked, um, Tuesday afternoon, and it wasn't, ah, it wasn't there.

JD:    Yeah. She had, she had taken it down. And, then, she put it back up again. And, then, she had taken it back down again. And, I don't know if you had seen, um, yesterday morning, she put up one about whoever is monitoring my Facebook.

LW:    Yes.

RT:    Yes.

6

001551

JD:     Yeah. Okay. So, you've seen that.

RT:     Yeah

JD:     And, I. She, ah, she does reference in there, that she's a witch. Um, that is the first that we've seen anything, um, her commenting that she's a witch.

RT:     Okay. Jody, do you know offhand, um, any of the names, do you recall any of the names that have supported her on Facebook?

JD:     Let me see if I can. I've. I've actually just pulled up her, um, page. It's right in front of me. Um. There's one woman, Laura Godin, Goodin.

[sound of cell phone ringing]

JD:     G-O-D-I-N is the last name.

RT:     Yeah.

JD:     Um. Ah, Dianne Lyons is another one. D-I-A-N-N-E. And, the last name is Lyons, L-Y-O-N-S.

RT:     Okay.

JD:     Um. and, then, another one is Cindy Meserve, M-E-S-E-R-V-E.

LW:     Do you have a sense, generally, of, of who the people are, whether you perceive them as supporters, or not, who, sort of, respond to her posts about the Court system?

JD:     Well, it.

LW:     And, various injustices?

JD:     Yeah. See, I, I, I'm sure Tracey probably shared with you, um, early on into her litigation against Granite State Credit Union, she pulled in, um, Mike Gill. I don't know if you're familiar with Mike Gill.

LW:     Yes.

JD:     Or, not. Um, and was a huge, ah, supporter of his. I believe there's also a State Rep. Kevin Avard, I believe his name is. Um, she has reached out to these. And, there's a whole group of supporters of these folks that believe in the conspiracy theories, and that kind of thing. Um.

LW:     Do you, do you? And, ah, do you recall whether, ah, Mike Gill and, um, and/or Avard respond? Do they, are they on her Facebook page, responding?

JD:     They. So, Mike Gill was, he, ah, got very involved with her. Had her on his show. He went to a couple Court appearances with her.

LW:     Right.

7

JD:   Then, for some reason, they had some sort of a falling out.

LW:   Uh, huh.

JD:   Um, she, she had put up a post that, ah, he was a big baby, or something.

LW:   (Chuckles.)

JD:   Um, and, then, she also went on Kevin, ah, Avard's show, as well. Um, and that's. Ah, so, so when she's pulling in those kind of figures out in the media that are doing radio shows, and doing YouTube videos, and stuff. And, um, you know, in my opinion, defaming the credit union. That's, that's really one of the reasons that I got.

LW:   Right.

JD:   You know, active in monitoring her.

LW:   But, do you, do you know whether Mike Gill and, and Avard, ah, appeared on her Facebook page?

JD:   They. Ah, honestly, I think.

LW:   I just wondered if you had a recollection.

JD:   I think, maybe, a year or two back. I don't remember.

LW:   Okay. Got you. Got you. So, we interrupted your, ah, telling us about seeing these posts, and, sort of, what happened next.

JD:   Okay. So, ah, this was Sunday. Um, I reached out to Tracey. And, then, I had e-mailed them originally. And, then, when I saw the post, um, which I felt. This is again, in my opinion. Um, was, was threatening towards the Judges, and, um, Attorney Gallant. I called Tracey immediately, and just said, you know, I, I think you need to give these people a heads-up. Um, I was concerned. And, then, I screen-shotted that, and shared that with our executive team, as well.

RT:   Okay.

JD:   Um. I've continued to monitor since. I, I'm assuming someone must have reached out to her. Um, because she now is aware that folks are monitoring. I don't think she knows that it's Granite State Credit Union monitoring her. And, that's fine with me. And, my, my hope is that, um, I, I want to keep the credit union just out of this as much as we can. And, I. Our. In, in terms of social media, and our. Ah, the way we approach folks like this. Less is more. We try not to engage. I don't want to incite. Um, if I can. You know, if she can get distracted with something else, that's great. I just, I want to keep the credit union's good name out in, ah, the public.

LW:   You said that, that you noticed she had taken the post or posts down, but then put them back up. When, when did you notice that?

001553

JD: Um, I believe I noticed. So, let's see. They went up on Sunday. They were still there Monday. I think it was Tuesday that she took them down. And, then, she may have put them back up on Wednesday. And, then, they came back down again, I believe yesterday.

LW: Ah, when you say - put them back up, what? How, how does one do that?

JD: So, if you, on your Face. I don't know if you are familiar with Facebook. But, on your. If you put up a post.

LW: Yeah.

JD: Um, and you're looking at the box that that post is within, up in the upper right corner, there's a little arrow that points down. If you hover over that, a drop down menu, menu will, will come up. And, you can, um, you can opt to hide this from your page, or delete the post entirely. So, I'm assuming that she had hidden it from her page.

LW: I see.

JD: And, then, went back in, put it back up on the page, and then took it down.

LW: And, what, and what came back up?

JD: The exact same post. The. It, it was the exact. She. It's as if she had just put it in a drawer, and then she put it back out.

LW: But, I look at them as three different posts. One about the aunt. Um, then, about Judges and that fucking attorney. And, then, and then the more specific one about Weaver, Anderson, and Gallant.

JD: Right. And, now, I believe, ah, so, those are all down now.

RT: Right. But, but.

JD: If she, if she has not deleted them, she has hidden them.

LW: The.

RT: Jody, are those, is it an original post, and then she's commenting on the original post? Or, are they three separate posts?

JD: That is, um. They were the original post. Is the, the one that's in the main body. The. the, that's the, the verbiage that falls underneath her profile picture. And, then, you'll see where other folks can, um, comment on those. She's commented within her original post. So, those three posts would be considered one.

LW: Oh.

JD: One post with some sub.

9

RT:     Okay.

JD:     Subcomments in it.

RT:     All right. So, the first, the original post – as my aunt just asked me, are you really going to be able to live with yourself with all the pain, et. cetera? Is that the original post?

JD:     Yes. It is.

RT:     Okay. And, then, ah, she writes, ah – be the first to like this. Or, I don't know if she writes it, or that just automatically comes up. But, then, underneath that, it says – the Judges and that f'ing attorney are so next. That's her commenting to the original post?

JD:     Yes.

RT:     And, then, the final one is – Donald dead, mother just lost it all. Again, that's her commenting to her original post?

JD:     Yes.

RT:     Okay.

LW:     And, when, when the comment goes back up, are, are all those, that series of three?

JD:     I did not see all of those. Um, I think she had those subcomments.

LW:     Yeah.

JD:     Um, those were, um, hidden.

LW:     I've got you. So, so just, ah, the original post came back up?

JD:     Right.

LW:     Got you. Do you have any reason to believe that, that she knew that people involved with either the bank, or with her, her litigation were checking out her Facebook page?

JD:     Yeah. I do. Because, she has had some, um, she has had some posts up there. Um. Well, I, I'm sure you saw what when up last night. Has ever, has anyone ever wondered that maybe I post stuff, and say stuff to screw with your tiny idiotic brain? Um, that, I believe is directed probably at me. Um, yesterday morning was the post – whoever is monitoring my Facebook page, since you understand my stress level, think you can get me a massage for my birthday. And, for your little brain, the A.G.'s Office really doesn't care that I'm a witch. Ba-Ha-Ha-Ha. Get a life, loser. But, even prior to this, um, about a year ago, I had seen a post. And, she just shared it again within. Oh, here it is. Um. Ah, so, one year ago, she had put up a post, ah – hello, stalker, I'm doing fine. Thanks

10

for checking up on me. And, then, she shared it again on January 25th of 2017 at 1:37 P.M.

RT: What was the, ah? What did she say? Hello who?

JD: This was, um. Ah, this was, ah, like, like a meme. Are you familiar with what memes are?

LW: Yes.

JD: Well. Ah, Yeah. So, so, this was just, it's just a, it's, it's like a photo, if you will. And, it's just gray background. And, it's just in a, a straight font setting, with copy on it. So, it's as if it's just a picture she put up. But, all it reads is – hello stalker, I'm doing fine. Thanks for checking up on me.

RT: And, and she re-posted that January 25th?

JD: 25th. Yes. And, so, when, so she shared a memory. And, in, in your Facebook feed, memories will pop up from, like, a year ago, or two years ago.

RT: Yeah.

JD: And, you have the option of, of re-posting that, or not. So, it would have been a year ago, January 25th, 2016, she posted that for the first time.

RT: Oh.

JD: And, now, on January 25th, 2017, she's sharing that memory from one year ago.

RT: Okay.

LW: What, what, ah, about that, suggests to you that she was aware?

JD: Um, ah, ah, just the fact that it says – hello, stalker, I'm doing fine. Thanks for checking up on me.

LW: Um, hmm.

JD: And, she's putting it on her Facebook page. My sense, or my interpretation would be, that she's aware that folks are, um, are checking, ah, you know, checking her on Facebook.

LW: Got it.

JD: We've given her no indication. Again.

LW: Um, hmm.

JD: Um, I don't want to incite this woman.

LW: Right, right, right.

11

RT:    Okay.

JD:    And, I don't know if. I, I'm assuming, you folks are, are monitoring her
       Facebook, as well. Um, she does have a couple videos, that honestly I haven't
       really gone through all of them. Um, that she posted January 18th at 7:02 P.M. I
       think it's, um, videos she took in the Courtroom. 'Cause, she, ah, she says – how
       to tell a Judge, and a psycho acts, you're done. And, it, and it looks like it's video
       from when she was, um, in Court.

LW:    Okay.

RT:    Okay.

LW:    Thank you.

RT:    Ah, Jody, anything, um, we haven't asked you, you think would be important for
       us to know?

JD:    Um, ah, No. I, I, um. Ah. I would be careful if anybody goes to the house. She
       posts pictures. She has two very big dogs. Ah, she's got a German Shepherd and
       a Rottweiler. Um, I just, I mean, honestly, again, just, just a comment. I, I
       almost feel sorry for her. I, I just, I think she's very, very troubled. But, um, I'm
       just concerned, like, ah, ah, with the safety of folks. Ah, ah, again, I don't know
       that she would do anything, or not. But, um, I, I think clearly, she needs some
       help.

LW:    Yeah.

JD:    And, I'm concerned about her, her. She's. Ah, the younger son lives with her.
       Um, the older son lives with his father, apparently.

RT:    Okay. Alrightee. Um, so, when you're back in the office, if you have a chance to
       look at that, ah, original e-mail, or, ah, Facebook posting that.

JD:    Yes. I will, I will pull that for you guys. Um, does Tracey have, ah, e-mail
       address, or?

RT:    Yes. Ah, she's e-mailed me a couple things already.

JD:    Okay. So, I, what I'll do, is, I'll scan that. And, we'll, um. I can scan. I'm going
       to be back in the office tomorrow. So, I will find that, and, ah, scan it over to you
       guys. Take a look at it. So, you have it for your files.

RT:    Okay. Well.

LW:    Perfect.

RT:    Ah, we appreciate your time today. And, I'm going to shut this recorder off.

JD:    Okay.

12

001557

**25:22 (total length of tape)**

**END OF INTERVIEW**

/ng

1625813

13

001558

1/25/16

 **Janet Delfuoco** shared Jesci Larochelle's photo

January 13 2015

Psycho ex and a few others... Hahaha,

# hello stalker. i'm doing fine, thanks for checking up on me.

Share

**Janet Delfuoco**

001600

1/25/11

 **Janet Delfuoco** 

                                    

 **Jesci Larochelle**

hello stalker. i'm doing fine, thanks for checking up on me.

Like     Comment     Share

001567



**Janet Delfuoco**          02/05/17

15 mins · 🌐

as my aunt just asked me....are you really going to be able to live with yourself with all the pain you are causing your family...my response was yep, let them all die and suffer....hear that Diane...suffer!

 Like           Comment           Share

Be the first person to like this.



**Janet Delfuoco**
the judges and that fucking attorney are so next.......so so next.

11 minutes ago · Like · Reply

001565

going to be able to live with yourself with all the pain you are causing your family...my response was yep, let them all die and suffer....hear that Diane...suffer!

02/05/1

 Like        Comment       Share

Be the first person to like this.

 **Janet Delfuoco**
the judges and that fucking attorney are so next.......so so next.

1 hour ago · Like · Reply

 **Janet Delfuoco**
Donald.. dead, mother just lost it all, Diane sick, husband sick.... next is weaver, Anderson, and gallant i will give you the shirt off my back and heal your diseases, but i am also just as capable of killing you off......don't ever cross me with corruption and greed.

001566

2/6/17



**Janet Delfuoco**

the judges and that fucking attorney
are so next.......so so next.



**Janet Delfuoco**

Donald.. dead, mother just lost it all,
Diane sick, husband sick.... next is
weaver, Anderson, and gallant i will
give you the shirt off my back and
heal your diseases, but i am also just
as capable of killing you off......don't
ever cross me with corruption and
greed.



**Janet Delfuoco**

as my aunt just asked me....are you really
going to be able to live with yourself with all
the pain you are causing your family...my
response was yep, let them all die and
suffer....hear that Diane...suffer!

000036



**Janet Delfuoco**

15 mins · 🌐

as my aunt just asked me....are you really going to be able to live with yourself with all the pain you are causing your family...my response was yep, let them all die and suffer....hear that Diane...suffer!

 Like       Comment       Share

Be the first person to like this.



**Janet Delfuoco**
the judges and that fucking attorney are so next.......so so next.

11 minutes ago · Like · Reply

000042

2/8/17

 **Janet Delfuoco**



# Has anyone ever wondered that maybe I post stuff and say stuff to screw with your tiny idiotic brain.....lol ☺

Like            Comment            Share

 3

 **Janet Delfuoco** Now Eric. . I know you laughing at me right now.
Like   Reply



001563

**Peasley, Mary M**

| | |
|---|---|
| **From:** | Tracey Healey <thealey@gscu.org> |
| **Sent:** | Monday, February 06, 2017 5:00 PM |
| **To:** | Cliff Gallant; Rick Fradette |
| **Subject:** | Picture of Delfuoco |

**This message was sent securely using ZixCorp.**

Good evening,

Here is an updated picture of Ms. Delfuoco; this was in January at our Concord Branch. Please let me know if there is anything else you need.

Thank you,



**Tracey Healey**
Vice President · Operations
**Granite State Credit Union**
**ph** 603.668.2221  800.645.4477  **ext** 3144
PO Box 4320, Manchester NH 03108
thealey@gscu.org   www.gscu.org

*********************Confidentiality Notice***************************
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing, or other use of this e-mail by persons or entities other than the addressee is strictly prohibited. If you receive this e-mail in error, please notify the sender immediately and delete the material from any computer.

271-3671 or reply to justice@doj.nh.gov <mailto:justice@doj.nh.gov > if you are not the intended recipient and destroy all copies of this electronic message and any attachments

**From:** Tracey Healey [mailto:thealey@gscu.org]
**Sent:** Tuesday, February 14, 2017 6:44 AM
**To:** Tracy, Richard
**Subject:** RE: GSCU  FB Page

Good morning,

I wanted to inform you that Jody Ducharme was not able to locate the article in which Delfuoco made derogatory comments towards GSCU staff after a robbery occurred in my Nashua branch in 2014. If you have any questions please let me know.

Thank you,

**Tracey Healey**
Vice President - Operations
**Granite State Credit Union**
**ph** 603.668.2221 | 800.645.4728 **ext** 3114
PO Box 6420 , Manchester NH  03108
thealey@gscu.org  www.gscu.org

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*Confidentiality Notice\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information.  Any review, dissemination, copying, printing, or other use of this e-mail by persons or entities other than the addressee is strictly prohibited. If you receive this e-mail in error, please notify the sender immediately and delete the material from any computer.

**From:** Tracey Healey
**Sent:** Thursday, February 09, 2017 8:49 AM
**To:** 'richard.c.tracy@doj.nh.gov'
**Subject:** GSCU_FB Page

Good morning,

Jody was able to provide me the name of the second FB page we believe was created by Ms Delfuoco. See below.

Thank you,

**Tracey Healey**
Vice President - Operations
**Granite State Credit Union**
**ph** 603.668.2221 | 800.645.4728 **ext** 3114
PO Box 6420 , Manchester NH  03108
thealey@gscu.org  www.gscu.org

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*Confidentiality Notice\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information.  Any review, dissemination,

ph 603.668.2221 : 800.645.4728 **ext** 3510
PO Box 5420 , Manchester NH  03108
jducharme@gscu.org  www.gscu.org

********************Confidentiality Notice***************************
This e-mail is intended solely for the person or entity to which it is addressed and
may contain confidential and/or privileged information.  Any review, dissemination,
copying, printing, or other use of this e-mail by persons or entities other than the
addressee is strictly prohibited. If you receive this e-mail in error, please notify the
sender immediately and delete the material from any computer.

**From:** Tracy, Richard [mailto:Richard.Tracy@doj.nh.gov]
**Sent:** Wednesday, February 22, 2017 1:47 PM
**To:** Jody Ducharme; Tracey Healey
**Subject:** RE: GSCU_FB Page

Hello Jody and Tracey,

Could you confirm that the following chain of events took place, if incorrect please advise me of the correct steps taken.

Jody you learned of Janet's FB post on Sunday afternoon 2/5/17 while visiting with your father.  You notified Tracey, who in turn notified Attorney Gallant.

2 questions:
  1.  Who took the screenshots of Janet's FB post? Jody or Tracy?
  2.  Were both notifications to Tracey and to Attorney Gallant done on Sunday 2/05/17, or Monday 2/6/17?

Thank you for your time, Dick

Richard C. Tracy, Chief Investigator
Criminal Bureau
Attorney General's Office
33 Capitol Street
Concord, NH  03301-6397
(603) 271-3671
(603) 271-2110 (FAX)
richard.c.tracy@doj.nh.gov
EBIN A 215

The information contained in this electronic message and any attachments to this message may contain confidential or privileged
information and is intended for the exclusive use of the addressee(s)  Please notify the Attorney General's Office immediately at (603)
271-3671 or reply to justice@doj.nh.gov <<mailto:justice@doj.nh.gov>> if you are not the intended recipient and destroy all copies
of this electronic message and any attachments

**From:** Jody Ducharme [mailto:jducharme@gscu.org]
**Sent:** Tuesday, February 21, 2017 12:08 PM
**To:** Tracy, Richard; Tracey Healey
**Subject:** RE: GSCU _FB Page

2

001608

# EXHIBIT "C"



## Doris O'Neil

| | |
|---|---|
| **From:** | Tracey Healey <thealey@gscu.org> |
| **Sent:** | Sunday, February 05, 2017 3:06 PM |
| **To:** | Cliff Gallant; Doris O'Neil |
| **Subject:** | Fwd: Escalated Delfuoco |
| **Attachments:** | image1.PNG |

**This message was sent securely using ZixCorp.**

Hello,

As you are aware we continue to monitor her social media page and wanted to send this along.

**Tracey Healey**
Vice President - Operations
**Granite State Credit Union**
ph 603.668.2221 | 800.645.4728 **ext** 3114
PO Box 6420 , Manchester NH 03108
thealey@gscu.org  www.gscu.org

★★★★★★★★★★★★★★★★★★★Confidentiality Notice★★★★★★★★★★★★★★★★★★★★★★
This e-mail is intended solely for the person or entity to which it is addressed and
may contain confidential and/or privileged information.  Any review, dissemination,
copying, printing, or other use of this e-mail by persons or entities other than the
addressee is strictly prohibited. If you receive this e-mail in error, please notify the
sender immediately and delete the material from any computer.

> **From:** Jody Ducharme <jducharme@gscu.org>
> **Date:** February 5, 2017 at 3:03:16 PM EST
> **To:** Tracey Healey <thealey@gscu.org>, Executive Team <ExecutiveTeam@gscu.org>
> **Subject: Escalated Delfuoco**
>
> I just called Tracey about this as she escalated her threats on Facebook- screen shot below:
>
> **Jody Ducharme**
> Marketing Manager
> **Granite State Credit Union**
> ph 603.668.2221 | 800.645.4728**ext** 3510
> PO Box 6420 , Manchester NH 03108
> jducharme@gscu.org  www.gscu.org

[▣]

Sent from my iPhone

**Doris O'Neil**

| | |
|---|---|
| **From:** | Tracey Healey <thea.ey@gscu.org> |
| **Sent:** | Sunday, February 05, 2017 3:12 PM |
| **To:** | Cliff Gallant; Doris O'Neil |
| **Subject:** | Fwd: Delfuoco Post |
| **Attachments:** | image1.PNG |

This message was sent securely using ZixCorp.

Here is the first post as well.

**Tracey Healey**
Vice President - Operations
**Granite State Credit Union**
ph 603.668.2221 | 800.645.4728 ext 3114
PO Box 6420 , Manchester NH  03108
thealey@gscu.org  www.gscu.org

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*Confidentiality Notice\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This e-mail is intended solely for the person or entity to which it is addressed and
may contain confidential and/or privileged information.  Any review, dissemination,
copying, printing, or other use of this e-mail by persons or entities other than the
addressee is strictly prohibited. If you receive this e-mail in error, please notify the
sender immediately and delete the material from any computer.

Begin forwarded message:

> **From:** Jody Ducharme <jducharme@gscu.org>
> **Date:** February 5, 2017 at 2:07:24 PM EST
> **To:** Tracey Healey <thealey@gscu.org>, Executive Team <ExecutiveTeam@gscu.org>
> **Subject: Delfuoco Post**
>
> This went up 15 minutes ago
>
> Sent from my iPhone
>
> **Jody Ducharme**
> Marketing Manager
> **Granite State Credit Union**
> ph 603.668.2221 | 800.645.4728**ext** 3510
> PO Box 6420 , Manchester NH  03108
> jducharme@gscu.org  www.gscu.org



1

# EXHIBIT "D"



## INTERVIEW TRANSCRIPTION

**INTERVIEWEE:**   **Judge Mark Weaver [VIA TELEPHONE]**

**INTERVIEWERS:**   **Investigator Richard C. Tracy, New Hampshire Attorney General's Office; and**

**Assistant Attorney General Lisa L. Wolford, New Hampshire Attorney General's Office**

**SUBJECT:**   **State v. Janet Delfuoco**

**MATTER ID #:**   **2017123748**

**DATE:**   **February 9, 2017**

**TIME:**   **10:10 A.M.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RT:   It's February 9th, 2017. It is 11, ah, 56 p.m. ah, a.m. This is Investigator Richard Tracy with the New Hampshire Attorney General's Office. I'm at the Office of the Attorney General. Ah, with me is Assistant Attorney General Lisa Wolford and on the phone with us is Judge, ah, ah, Mark Weaver. And Your Honor, are you okay with us, ah, recording the conversation?

MW:   Yes.

RT:   Okay, thank you very much. Um, if you could sir, ah, start by telling us how you learned of this Facebook posting by, um, Janet Delfuoco.

MW:   It was forwarded, ah, to me in an email, ah, through, it was, ah, by Judge Anderson.

RT:   Okay. And what if any actions did you take after you received the, ah, email?

MW:   I went to, ah, speak briefly with Judge Anderson. Um, and, ah, just to let him know that I'd received it. That I was familiar with Miss Delfuoco from a case I had and, ah, um, and that, ah, I had seen postings by her in the past, which although not threatening me, um, had been threatening to her husband. And I wanted to touch base with him to find out if, ah, security had been notified. Um, and, ah, so that was the general gist of what we discussed.

1

000047

RT:   When you say you saw postings in the past, ah, was it, were they copies of postings that were presented at court hearings or were, did you actually go on Facebook and see the posting?

MW:   No I-I'm not on Facebook, um, so they were copies of postings that I believe it was her ex-husband, ah, brought to court and submitted to the court either through a pleading or at a hearing because they're still in the court's file.

RT:   Could you, um, explain for us, ah, wh-what are some of the hearings to the best of your recollection, ah, that you've had wh, involving Janet Delfuoco?

MW:   Alright.  I do not have the file right in front of me but I do have access to a number of my orders.

LW:   Okay.

MW:   And, um, the orders, ah, that I have in her case date back to 2014, and deal with parenting issues between she and her ex-husband.  All post-divorce.

RT:   Okay.

MW:   So I had a number of hearings both on emergency ex parte motions regarding actions that they asserted against each other.  Ah, ah, attempts to, ah, modify custody, ah, orders, ah, in joining, seeking injunctions against certain actions.  Um, I believe those won by the husband seeking a protective order 'cause I ultimately did issue one as a result of the postings that were submitted to the court.  And, um, and I think the ff, the last two orders that I have were as a result of a, um, ah, issues again regarding, ah, who would, ah, have the children, their two, two children, ah, ultimately, ah, one is living with the father and one's living with the mother.  But, um, there was one about the mother relocating with one of the boys to I think it's North Carolina and, ah, the other part of the, um, ah, dealt with her contacting the, the, the son that was staying with, ah, living with the, um, with his father and attempting to convince him to come down with her.

RT:   So was she, um, well, did it have to do with her, ah, excessively trying to reach out to her oldest son and have him come home or?  Or come to his house, her house?

MW:   Ah, (sigh), back to that order and I can tell you.  Um.  Let's see.  The one regarding just find the last one, I, I think it's the last one on the ex parte.  Yeah it was an ex parte.  Ah, here it is.  This, eh-eh, an order and request for ex parte orders was a result of a hearing on September 24th, 2015.  (Clears throat)  Which was, ah, less than a month after the prior hearing and motions had been filed.  Ah, basically what it was that, ah, Mr. Goad had reported that after leaving the court on August 28th, um, that, ah, Miss Delfuoco told him that he would go to jail, that he was, she was gonna foreclose on his home, that he did not, if he didn't work

2

with her, his life would be a living hell. Um. And then he said, that he informed the Court that she had contacted Spencer, that's the child, the son that lives with him and tried to get him to move to North Carolina with her, um, and she, he alleged that she told Spencer that he had to move with her, in with her because, ah, dad was going to jail. (Clears throat) So, um, ah, let me find out there was also, um, and that, ah, Spencer was acting out at that point apparently, um, and his girlfriend's mother reported that Spencer had sent a text saying he was gonna kill himself due to his mother's actions. Um, he also told me that time that, that Miss Delfuoco had, had told him that the FBI's investigating him. Um, so that's when he submitted the copies of the texts she exchanged with Spencer (clears throat). Um, I'm sorry Miss Delfuoco submitted copies of texts that she exchanged with Spencer the night she was in er, the night she was creating problems. She reported that, ah, Spencer had been to the hospital with a concussion, he rides motocross but that Mr. Goad's failed to notify her of the injury, and, um, that I'll just read you the next part of my order. (Clears throat). Although the Court attempted to get further information from her, that was not possible. Instead Miss Delfuoco lost control of herself and left the Court after yelling at this judge without finishing her presentation or answering the questions the Court wished to ask of her. I then went through and reviewed the texts, um, and, and found that both parents behaved inappropriately with the children. That, ah, ah, Mr. Goad had been sharing too many details of the divorce with his son. (Clears throat)  So that he was trying to manipulate his son. And that, ah, the mother, Miss Delfuoco had been trying to manipulate him to goo, move back with her to North Carolina. Um, and, ah, she blamed him for making her twenty times more madder, quote, end quote, um, indicating she would go after Mr. Goad even more aggressively to get the money that she says is due to her, this was in text with her son. Um, and then I went on to talk about the communications that happened, um, and ordered that, um, both parties re, cease all communications with their children about issues related to the case, especially negative statements about each other, and Miss Delfuoco was not to initiate any communications with Spencer. Should Spencer wish to contact her she could respond but she was prohibited from attempting to convince him to move with her and cannot engage in any custodial time with him until she complied with the Court's prior order regarding counseling, which is something I previously ordered for her to seek anger management counseling, and therapy. Um, and, ah, I'm not gonna need everything here but just to hit the highlights.

LW:   Yep.

MW:   Um, ordered the parties to communicate only by written communications, texts or emails. Ah, gave Mr. Goad sole decision making over Spencer and dismiss, decision making over Sam who's the younger boy would be joint. Um, ordered her to cease all communications with, ah, the father, ah, that are threatening, harassing, intimidating in any way. Ordered them to cooperate with his each other for signatures, for passports or other documents they may need for the boys

3

and that ordered the father to comply with all prior orders regarding payment of medical bills for the children, which is another issue.

LW:   What was the date of that order?

MW:   Um, I don't have the signed order in front of me. Ah, but I usually sign them the date that they're finished.

LW:   Okay.

MW:   So the date was, just find it again because I had to close it and get out of it to go look at the date.

LW:   Is that the February 2015 one I thought?

MW:   No that's October 2nd, 2015.

LW:   Okay. Were you involved in the, the initial e-custody determinations, it?

MW:   No.

LW:   You were not?

MW:   No.

LW:   How old was Spencer? I take it he was an older teenager.

MW:   Yeah, Spencer I believe is about sixteen right now.

LW:   Now he's sixteen okay.

MW:   Believe Sam is around fifteen.

LW:   Um, so what, ah, to the best of, of your understanding, um, wh-what would, would Miss Delfuoco have been unhappy with you about? Was it that order giving sole?

→MW:   I mean that was a long time ago so I suppose it could be some, ah, ah, that her hanging on to that. Ah, although, you know, nothing's happened in the court, ah, from then until last, about last week when, um, one of our clerks mentioned to me that she had come in to file a petition to change, ah, the name of Sam.

LW:   Okay.

MW:   And was asking that I not hear that, I hear all the name changes, and she asked the clerk that, ah, she told the clerk she didn't want me to hear it. The clerk informed

4

her she'd need to file a motion as to why I shouldn't sit on the case.  Um, I still haven't seen that paperwork. I've just been told about it.

RT: Was she trying to change the first name or the last name?

MW: I don't know.

RT: Right.

MW: I assume the last name.

RT: Okay.

MW: You know it, it looks like a situation where, ah, um, you know, one parent wants to change the, the last name to be their last name.

RT: Right.

LW: Were there other, ah, were there other decisions that you made that may have, ah, restricted or she might have per-perceived as restricting her access, to Spencer?

MW: Er. Well that last one was the primary one.

LW: Okay.

MW: That was culmination of a, the number of orders over time.

LW: Okay. And you said in your email you issued a restraining order against her for threatening her ex-husband.

MW: Right.

LW: Um, was that the same?  Your email mentions.

MW: I think there was.

LW: She stormed outta the courtroom.

MW: If I could find that, that order. That may have been the August 28th hearing. Let's see. Um. No that's on the request to move.

LW: We can take a look at the court file too.

MW: Yeah I mean they're all in there.

LW: Yeah, okay.

000051

MW:  Just seeing if I can locate it fairly quickly.  Um.  Let's see I've got that one.  (Noise with mouth)  I'm trying to think which one contained the.  It might have been.  This one right here.

LW:  Is it all part of one docketed case?

MW:  Yes.  It's all under case number 618-2010.

LW:  Okay.

MW:  EM64.

LW:  Thank you.

MW:  Um, there was a dispute earlier in the year about, um, how Mr. Goad was taking Spencer down and getting him a job in Massachusetts, and she didn't want him to have a job in Massachusetts, she wanted him to work here and, um, she also alleged that he was gonna be staying with, ah, relatives of hers that she said were drug addicts and alcoholics I believe.  Um, definitely alcoholics, I can't remember if she said drugs or not.  Ah, but at least alcoholics and, and, and they, she shouldn't be with them, um.  Yeah this is the order.  There was an order on ex parte emergency motion on James Goad that was, ah, there was a hearing held on June 26th.  Um, and that was the one where Mr. Goad presented to me the, ah, the prior postings.

LW:  Okay.

MW:  And the Facebook posts that she admitted to posting them.  Um, she posted a pornographic photograph of one man performing fellatio on another.  And she claimed it was because she wanted to find out who was looking at her Facebook posts.  She further claimed that a reference to Mr., ah, Goad blowing this judge was not a specific reference to this judge but could be any judge.  As Miss Delfuoco said she has at least two legal matters pending in different courts at this time.  And then she went on, and I'm reading from the order, she went on to claim that the reference to the gun and the violent movie, which was, ah, further down in the text, were not about Mr. Gold, Goad at all, as she did not name him.  When the Court pointed out that she referred to her ex, she claimed that she was referencing some other ex in her life although she failed to specify who that might be.

LW:  Okay.

MW:  Um.  The.

LW:  You said June 26th, 2015?

6

MW:  That was the hearing, um. And so, at the end of that, I found that the, ah. Ah, her postings show that she has no respect for this Court and has serious anger issues. Her anger, anger issues have been mentioned by witnesses in the past as well as admitted by her during prior hearings when she has displayed her volatility. Given her actions, this Court.

LW:  (Coughing)

MW:  Has questions about her ability to co-parent with Mr. Goad and finds that she has interfered with Spencer's summer job. Um, then I refer to some earlier findings about issues with co-parenting and then entered the, ah, a restraining order, ah, pursuant to RSA 461-A:10. Um, which is the custody statute.

LW:  Okay.

MW:  And refrain, had her refrained from abusing or interfering with, ah, the liberty of Mr. Goad, entering his premises, ah. And, ah, found that the, ah, the Facebook posting and her anger issues show there's a likelihood of physical or emotional harm could result in Mr. Goad and enjoined her from harassing, intimidating or threatening Mr. Goad and his household members including Spencer. (Clears throat) And there were other things in the order as well but that's, I think that's relevant, the most relevant to what we're talking about.

LW:  When you described, ah, Miss Delfuoco was, ah, you said I thought that she lost control of herself, what did that look like?

MW:  Um, she would get very upset, would not stop talking to let me ask a question or interject and then would start to speak louder and faster and eventually would start crying to where she would then close up her papers, um, ah, crying, yelling and tell me that she wasn't having anything more to do with the Court or something to that effect and would walk out. And I think she actually only walked out once.

LW:  Okay.

MW:  But there have been prior hearings where she got almost to that point.

LW:  Okay.

RT:  Sir, can we go back to the Facebook posts? When you first learned of it, what was your initial reaction in whether or not you had any concerns about it?

MW:  Ah, the one that Judge Anderson sent to me?

RT:  Yes.

MW:   Um, I didn't feel personally threatened because, um, of the things that she's threatened against Mr. Goad. And she's never done anything to him.

LW:   Okay.

MW:   She's been deeply angered with him for years. Um, and has not taken any violent action against him, she's done harassing things, um. Things that deserve a restraining order but she's never, ah, that I can recall having reported to me anyway, done things such as point a gun at him, you know, tried to strike him, throw something at him, ah, stalk him outside his house. Those weren't the types of things that were reported, it was more of these direct confrontations of yelling at each other, um, not following the orders of the Court and then posting something that said she'd like to see him die. I-eh, the, ah, there was a movie that's referenced in her, in her text, ah, not text in the, ah, in the posting, um, that, ah, is, ah, quite a violent movie. Let's see it's, it's called I Spit on Your Grave. And.

RT:   That's the name of the movie?

MW:   Yeah and that's the name of the movie. Ah, she said.

LW:   (Unintelligible)

MW:   She would quote like to do all sceneries, I think she meant scenes, to my ex right now end quote. And then she went on to describe how the woman "went after" the last guy in the movie and "stuck a shotgun up his ass and wired the trigger to another guy and when he moved it went off and the bullet came out of his mouth right into the other period."

LW:   Sounds like a classic.

MW:   Ah, yeah. So that was, you know, that was in 2015. So given it's been no contact since then.

LW:   Yup.

MW:   That the only thing pending is this name change. I didn't feel upon reading that that she would be stalking me trying to kill me at this point. I, ph, understand she's still got a lot of anger, but it didn't make me feel that she would be physically trying to harm me right away.

LW:   Okay.

RT:   But you still, I think earlier you said you wh, you made sure that security had been notified is that correct?

8

MW:  Yes, absolutely.

RT:  Okay.

LW:  And why was that?

MW:  Well because even though I may feel that way, I could be wrong.

LW:  Okay.

MW:  (Chuckles)  And I, I want security to know because they're much more experienced in these things than I am.  And they, frankly my opinion is they can't do their job unless they have the information.

LW:  Did they tell you, um, did you discuss with, with security what precautions they might take?

MW:  I did not.

LW:  Okay.

MW:  Um, I did have a conversation with, um, the, ah, circuit court security.  Um, let me find his name.

RT:  Would that be Jason?

MW:  Well it was somebody work, who works with Jason.  John Dube.

RT:  John Dube yes.

LW:  Yes.  Okay.

MW:  So I just, I went over the basics with him.

LW:  Did, eh, did, um, Mr. Dube or-or anyone else in the court suggest to you ways in which you could assure your security?

MW:  No.  I haven't had that conversation with anyone yet.

LW:  Have you, have you done anything to change your routine?

MW:  Um, no.

LW:  Okay.

000055

RT:  Judge Weaver, anything, ah, we haven't asked you you think would be important for us to know?

MW:  No I think I've given you, you know, the, ah, most of the salient history of this. Um, there are lotta more details and flavor you could get by looking at the actual orders and file but I think you've got plenty of current information to, at least help you understand the circumstances and, um, why I feel the way I do.

RT:  Very good.  Um, if there's nothing else, I'm gonna shut the recorder off.

MW:  Okay.

**END OF TELEPHONIC INTERVIEW - 20:18 minutes**
1626678

10



 and **4 others**.



Janet Delfuoco

Ever see that movie ! spit on your grave, I would
like to do all sceneries to my ex right now.........

000099



6:33

Be the first to like this.



**Janet Delfuoco**
Oh no this is a really violent movie...I
could barely watch it. The very last guy
she went after, she stuck a shot gun up
his ass and wired the trigger to another
guy and when he moved it went off and
the bullet came out his mouth right into
the other guy



**Tony Clark**
Yep. A nice good sick movie



**Janet Delfuoco**
Did you see it?



**Tony Clark**
Yep



**Tony Clark**
Are ya sure you want to do all the scenes
with him or just the ones where she gets
revenge



**Janet Delfuoco**
Just the revenge, he already screwed me
more than i want to admit to...

# Peasley, Mary M

| | |
|---|---|
| **From:** | Hon. Mark Weaver █████████████ |
| **Sent:** | Wednesday, February 08, 2017  3:29 PM |
| **To:** | Wolford, Lisa L |
| **Cc:** | Tracy, Richard |
| **Subject:** | RE: Janet Delfuoco investigation |

2:30 should be fine. I will call you since the only way to get to me is through the call center, which can be cumbersome.

I also just spent a few minutes reviewing some of my prior orders involving Ms. Delfuoco and I did issue a restraining order against her for threatening her ex-husband, and at her last hearing with me she was so upset she stormed out of the courtroom and did not finish participating in the hearing.  However, that was in 2015.  There have not been any hearings with me since that time.

I look forward to speaking with you tomorrow.  Thank you.

MFW

**From:** Wolford, Lisa L [mailto:Lisa.Wolford@doj.nh.gov]
**Sent:** Wednesday, February 08, 2017 3:18 PM
**To:** Hon. Mark Weaver
**Cc:** Tracy, Richard
**Subject:** Janet Delfuoco investigation

Judge Weaver,

A 2:30 p.m. call tomorrow works for Investigator Tracy and me. We both plan to be here all day, though, so if it turns out tomorrow that another time is better, just let me know.

We can call you or you can call DCK's direct line, 271-3252. We would like to record the interview and will ask your permission to do so.

Thank you,

Lisa

Lisa L. Wolford
Assistant Attorney General
NH Department of Justice
Criminal Justice Bureau
33 Capitol Street
Concord, NH  03301
Bureau: (603) 271-3671
Direct: (603) 271-2068

The information contained in this electronic message and any attachments to this message may contain confidential or privileged information and is intended for the exclusive use of the addressee(s). Please notify the Attorney General's Office immediately at (603) 271-3658 or reply to justice@doj.nh.gov if you are not the intended recipient and destroy all copies of this electronic message and any attachments.

000130

# EXHIBIT "E"

*E*

## DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco<br>RSA 631:4-a - Harms or Threats to<br>Certain Government Officials | Richard C. Tracy | February 27, 2017 |

On February 9, 2017 at approximately 1125 hours Assistant Attorney General Lisa Wolford and I conducted a telephonic interview with Judge David ANDERSON, reference his knowledge of the threatening Facebook messages posted by Janet DELFUOCO.

Judge David Anderson,
Rockingham Superior Court
PO Box 1258,
Kingston, NH 03848-1258
10 Route 125,
Brentwood, NH
1-800-212-1234

Judge ANDERSON allowed for us to record the interview, refer to the CD recording or transcript of the interview for details.

| Page  1  of  1  pages  SIGNED | DATE 2-27-17 |

000743

INTERVIEW TRANSCRIPTION

| | |
|---|---|
| INTERVIEWEE: | Judge David Anderson [VIA TELEPHONE] |
| INTERVIEWERS: | Investigator Richard C. Tracy, New Hampshire Attorney General's Office; and |
| | Assistant Attorney General Lisa L. Wolford, New Hampshire Attorney General's Office |
| SUBJECT: | State v. Janet Delfuoco |
| MATTER ID #: | 2017123748 |
| DATE: | February 9, 2017 |
| TIME: | 11:25 A.M. |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

RT:     It's February 9th 2017, it is 11:25 a.m.  This is Investigator Richard Tracy with the New Hampshire Attorney General's office.  I am at the office of the Attorney General and with me is Assistant Attorney General Lisa Wolford and on the phone with us is Judge David Anderson with 'ah Rockingham County Superior Court and 'ah sir, do we have your permission to record this conversation?

DA:     You do.

RT:     Thank you. 'Um, sir, 'ah as Lisa was saying, 'ah explained to you briefly, the reason we are looking into this 'um, facebook post threats that came to our attention on 'ah Tuesday of this week. 'ah could you please explain to us how you first learned of these threats?

DA:     'Um, I learned of them through a friend whose a lawyer 'ah in town, I had a very brief conversation with him so I'm not exactly sure how he came to be in possession of what looks to me like a facebook page, but I believe it was most likely forwarded by Attorney Gallant 'ah who is represented, represented the Credit Union in this case and I think he forwarded to another attorney who is friends with the attorney I'm friends with and it went through three people I think to get to me.

RT:     And....

DA:     I suspect they did not want to file this formerly with the court and so were looking for a sort of a back channel way to get it to me.

RT:     Okay, and 'um do you mind sharing the name of the attorney that actually 'ah, provided you with the facebook post?

DA:     'Um, yeah, no. I guess that's fine, Joe Bussiere.

RT:     Okay and when you saw the post and the name of the individual on the post, Janet Delfuoco, what, did that ring a bell with you at the time, were you familiar?

DA:     Yes, I am familiar with her.

RT:     Okay.

DA:     I've had two cases with her, that have gone on for a while.

RT:     Okay. And do you know, 'ah, do you have a recollection as to what the case involves?

DA:     Yeah. I am familiar with both cases. One was a case involving her ex-husband & agreements that they had made, she had, she had agreed to allow her house to be used as collateral 'um in his effort to obtain financing to purchase a manufactured house and that all happened through Granite State Credit Union and so the initial suit was between her and Mr. Goad, her ex-husband, over agreements that she alleged they had made concerning payments he was going to make to her to basically compensate her for the extra debt she had put on the house and I found in her favor in that case and awarded her judgment and then, there's been post-judgment hearings that I've had in that case that went on and the decision came out I think about, it might have been summer of, it was the summer of '15, so that was some time ago and then separately 'um, Granite State Credit Union filed a lawsuit against her seeking an injunction against her making what they alleged to be defamatory statements 'ah, and in that case I, I denied their request for an injunction against her 'um, she then filed counterclaims against the bank, basically truth and lending and 'ah, you know, a series of counterclaims that are federal loan statutes and those claims I dismissed basically finding that they failed to state a claim. 'Um, she thereafter this past fall filed a new action, 'um, against Granite State Credit making, making very similar claims and that decision I, I, and I dismissed those claims, basically on the grounds that res judica, you know, legal doctrine saying once you've had a final decision on something you can't then refile the same action or actions you could have filed in the prior action and on that, on the grounds of that theory I dismissed this second lawsuit and that was recent, that was 'um, probably last week.

RT:       Yeah, we have 'ah, a copy of that decision though it's difficult for us to read at the time, we're gonna' have to get a new copy, but the date on the bottom of the next to your signature appears to be February 2nd, which would be last Thursday.

DA:       Right.

RT:       Okay.

LW:       How often 'um, to the best of your recollection. did Ms. Delfuoco appear before you in the litigation with her ex-husband?

DA:       Hm, it's hard to, it's hard to give you an exact number, I would imagine that we've had hearing. I've had her in court three or four times.

LW:       And what was her, what was her behavior like during those proceedings?

DA:       'Ah, inconsistent, 'um, she sometimes, and most recently in January, was the angriest I've seen her and she was frustrated with the, the pace of post-judgment recovery actions. not so much the pace but 'um, the 'ya know, she thought the court should be doing more to force him to pay the judgment. The last hearing sort of involved, in, in a November hearing, I think. he had agreed that he was going to sell this manufactured house. she's got an attachment on it, per, 'ah, per her judgment against him and he agreed that he was gonna' put that on the market and he agreed to use a particular broker that she wanted him to use and he, he reneged on the broker but he did go ahead and put it on the market, so she was upset about those two things really, the fact, well two things, one that he didn't use her broker and two, that he was asking what she thought was an excessively high price. $40,000 for this manufactured house. And so, at that hearing, I said, well, look let's, let's see where this sale goes and see if it produces sufficient money 'ah to pay off, pay off the judgment and so we scheduled another hearing, which she, she was in very bad spirits that day. The prior month she been in court for, she had to file a motion for contempt and 'ah. he had not shown up, that day she was in very good spirits, so I would describe as inconsistent.

LW:       Does she, does she ever make statements that might be characterized as menacing or threatening?

DA:       No, I wouldn't say so.

LW:       Was the fact of 'um, the fact that she had a facebook account, 'ah, ever mentioned in any of the proceedings?

4

DA:     I, I think he had pointed out, Goad, her husband, ex-husband had pointed out in a couple pleadings that, he said you ought to know what she's saying about you.

LW:     Oh, okay.

DA:     Some words to that affect and I had never really gone back and tracked down what she said, either on facebook or another mediums.

LW:     Okay.

DA:     So, I was, I was aware that there was a suggestion she had been making statements about the proceedings.

LW:     You never and you never checked yourself on facebook?

DA:     No.

LW:     Okay. And what about the Granite State Credit Union litigation, how many times do you recall she might have appeared before you in those cases?

DA:     Well, we had an initial hearing on that, I, I think, I know we had one initial hearing which was their request for an injunction against her, which I denied. 'Um, thereafter I think I did it largely on the papers.

LW:     Okay. And, anything in the. I might have, I guess I might have asked this, about both cases, but to the extent that I didn't, any, anything in the course of that litigation from Ms. Delfuoco that suggested 'um, a threat or menace.

DA:     She was extremely upset at Granite State and in one of the arguments she was making against Granite State is that 'um, she said that, she claimed that Goad had made misrepresentations in the loan documents to Granite State and she was upset that Granite State wasn't taking action to essentially void the agreement, 'um, based on those misrepresentations, so that that's my language not hers, but 'um, you, you know and so Granite State was taking the position, not, I guess not surprisingly that they had lent money on this and so if there was any, anybody had standing to, to argue about misrepresentations, it was them, but you know, that she wasn't really damaged by any of this 'cuz she knew who he, you know, the misrepresentations included his representing that he was still living at her house and his representation that he had never committed bankruptcy, filed for bankruptcy, but she knew all those things so it, it didn't really give her any claims, but, but she was very upset about 'um, Granite State not sharing documents with her, you know, they were taking the position

5

that 'cuz the lender was her ex-husband, she wasn't entitled to access to those documents. You know, the loan documents. And at one of those hearings they agreed they would provide that access and I had sort of noted that in the record that they had agreed to do so. But she, she was very animated, 'cuz they showed up, their lawyers showed up at one of the hearings that was in the Goad case, so even though it wasn't there, they actually were concerned, and, anyway, they, they showed up at one of those hearings and she, she voiced, in very strong terms, 'ah, her displeasure with Granite State.

LW:     But, now it sounds like in a manner which suggested a threat of physical injury.

DA:     I don't remember her saying anything like that.

LW:     How 'bout, with the, with the 'um, Granite State Credit Union, 'ah suit for defamatory statements, was facebook a part of that litigation?

DA:     You know I have to check, I think it was more statements that she was making on 'um, there's a, I think there is an ?? member of the House of Representatives of the State, the State legislature, I think he 'ah, heads all, one of those cable television shows, 'ah, local, local…

LW:     Mike Gill or Avard?

RT:     Kevin Avard?

DA:     Yes, yes, I think it is, so I think she appeared on his show and made some statements, you may be well ahead of where I am on all this, but 'um, that was, that was part of what, that was at least one of the media that he was, she was making comments on and that's why I remember Granite State arguing.

LW:     Got it.

RT:     Sir, when you saw the facebook 'ah, post, the ones that came out this past weekend, 'ah, could you tell us how you felt about that and whether or not you had concerns?

DA:     Well, I had some concern, I mean I haven't, she's very, she gets very upset in court about what's happened between her ex-husband and her and Granite State so I was not upset, I was not surprised to see that she was very upset about this. The, the tone of this was obviously different than what I've seen before.

LW:     How so?

6

DA:     Well, you, you know you can read this as being threatening, 'um.

LW:     Did you understand it as being threatening?

DA:     I, I didn't know.  I mean, I, I knew the language could be read that way, I hadn't seen her as being threatening like that in the past, so prior, prior to viewing this I hadn't viewed her to be a threatening individual, I viewed her to be very emotional, but, but not threatening and so this surprised me in that, in that regard.

LW:     Did, did you take any precautions after being shown this or, or what did you do after being shown?

DA:     Well, I forwarded it, 'um, to Jason.

RT:     Jason Jordanhazey?

DA:     Yes.

RT:     Okay.

DA:     And, 'ah, and to Judge Weaver and then I talked to people internally in the building the next morning and made sure security was aware of it, 'um, so, beyond that I haven't taken any additional steps.

LW:     So, you haven't, for example, taken a different route to court or 'um..

DA:     I, I haven't.

LW:     Concerned about home security or anything like that?

DA:     No, I, I haven't changed anything in terms of how I, how I travel to the court or home security or anything in that regard.

LW:     What were your conversations with the staff about?

DA:     Well, I was just making them aware that I had received this communication, 'um, you know, and people, the, the discussions we had internally were along the lines of does it make sense, do we consider this a real threat and, you know, it's hard to, hard to be sure either, either way in that regard, 'um, and there was some, some discussion of it and these sort of things that 'um, may be beneficial not to do anything.

LW:     Oh, what, what would, what would you do?  I mean as opposed to not doing anything, what, what, what were you considering?

7

DA:        I wasn't considering taking any steps, 'um, but this is just what I was hearing from security folks, that, the suggestion was that someone could reach out to her and talk to her and 'um, and you know, sort of let them know that we're aware of this, and, but, but the point was made that giving her that confirmation that that her communication has reached my ears and other people are aware of it as well, maybe counterproductive.

LW:        Were staff internally encouraged to, to do anything?

DA:        By whom?

LW:        Oh, either by you or by security, any conversations you're aware for example, just to, to know what she looked like or be aware.

DA:        People are aware of who she is, 'um, and so I think, it was, and I believe Maureen said it's been noted in the files so and, and the bailiffs and security are all, all sort of mentioned that they will be, you know, on, on guard and extra vigilent on days she's in court, so I had discussions to that affect.

LW:        Got it.

RT:        Sir, sir are you aware that it appears when she's before you, 'ah, on decisions involving or matters involving her ex-husband, Mr. Goad, that she's recording the 'ah, proceedings?

DA:        Yeah, I was to some extent, 'ah, there have been a number of hearings on, I'm not sure I can say that for every hearing, but I know she has, she has at least been recently filing 'um, request to record.

RT:        Okay. I am aware of 'um, one hearing where she actually, there's a, it's clear that there's a video camera in the court and another woman with her is recording it, but there's, I'm also learned of two other proceedings where it appears she's got her cell phone recording but it's not, 'ah, audio, video recording, it's more just audio, recording the proceedings audioally and I didn't know if the court was aware of that or not?

DA:        There, there have been enough hearings, I'd have to go back to the, the file to see whether she had filed something in advance of those hearings, I can't say I was, that I'm sure that I was aware of each one of those hearings that she was taping.

RT:        Okay.

LW:        I think.

000750

8

RT:      Sir, is there anything else you think 'ah, we should know that would be helpful or?

DA:      'Um, no, I, I don't think there is.  I think you have a pretty full picture of it.  Do you want to talk about what your sense of this is at this point or?

RT:      'Um, not, not at the moment, 'um.

DA:      Okay.

RT:      'Um, we still have some more interviews to conduct in regards to this, but if you have nothing else to offer I can shut down the recorder and 'ah, take us off record if you're okay with that?

DA:      Sure, I'm fine with that.


End of telephone interview.
/cae
1626705

**Peasley, Mary M**

| | |
|---|---|
| **From:** | Jason R Jordanhazy <jjordanhazy@courts state nh us> |
| **Sent:** | Wednesday, February 22, 2017 3:59 PM |
| **To:** | Tracy, Richard |
| **Subject:** | FW. |
| **Attachments:** | 0917_001 pdf |

Here is the email...

**From:** Hon. Dave Anderson
**Sent:** Monday, February 06, 2017 6:39 PM
**To:** Jason R Jordanhazy
**Subject:** FW:

Hi Jason.  I am forwarding a social posting that a litigant posted about myself and Judge Weaver.  I tend to doubt that she is serious about any of the threats she is making but I thought I should pass this along.  I am happy to discuss her case and what I know about her when you have a moment.

Thanks for your help and please let me know if the attachment does not go through.

Dave Anderson

1

000761

# EXHIBIT "F"

F

# DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet DELFUOCO RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | April 11, 2017 |

On April 6, 2017 at approximately 1142 hours I conducted a telephonic recorded interview with Sandra PEASE an assistant clerk in the Rockingham Superior Clerk of Courts Office. The purpose of the interview was to discuss a document dated 4/29/16 to Judge Anderson. We learned from Clerk Maureen O'Neill was prepared by Sandra PEASE after she had a phone conversation with Janet DELFUOCO. I discussed a second document with Sandra PEASE that was attached to the DELFUOCO file that states "PLEASE NOTIFY SHANON IN SECURITY OF ANY HEARINGS WHEREIN JANET DELFUOCO-GOAD WILL BE IN ATTENDANCE".

Sandra PEASE,
Assistant Clerk Civil Bureau.
Rockingham County Clerk of Courts Office
PO Box 1258.
Kingston, NH 03848-1258
1-855-212-1234

Sandra PEASE allowed for the conversation to be recorded refer to transcript or CD recording of interview for details of interview. On page 3, 4th line I asked Sandra PEASE about Janet DELFUOCO being "vulgar" that was based on a brief conversation that I had with Sandra PEASE prior to going on record.

Attached to this report are copies of the two documents I discussed with Sandra PEASE.

## INTERVIEW TRANSCRIPTION

**INTERVIEWEE:**   Sandra Pease

**INTERVIEWERS:**   Investigator Richard C. Tracy, New Hampshire Attorney General's Office; and

Assistant Attorney General Lisa L. Wolford, New Hampshire Attorney General's Office

**SUBJECT:**   State v. Janet Delfuoco

**MATTER ID #:**   2017123748

**DATE:**   April 6, 2017

**TIME:**   11:42 A.M.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RT:   Alright this is Investigator Richard C. Tracy, New Hampshire Attorney General's Office. It's, ah, April 6, 2017, it's 11:42 a.m. I'm at the Office of the Attorney General. And I'm on speaker phone with, ah, Sandy Pease. Is it Sandy or Sandra?

SP:   Sandra.

RT:   Okay.

SP:   S-A-N-D-R-A.

RT:   And ss-Sand, do you go by Sandy or Sandra?

SP:   Well here at the office it's Sandy.

RT:   Okay.

SP:   If, if my loved ones at home want me, they say Sandra.

RT:   Alright.

1

000753

SP:   You can go ahead and call me Sandy.

RT:   Sandy could you, ah, state your name again and spell your last name for the record please?

SP:   Sure my full name is Sandra Ann Pease.   P-E-A-S-E.

RT:   And.

SP:   Also known as Sandy.

RT:   And you understand the conversation is being recorded?

SP:   I do.

RT:   Okay.  And, um, so I wanna talk a little bit about, um, a. I's, I forwarded you a, ah, copy of, ah, two documents.  One of 'em was dated 4/29/16 and up top it's typed in it says Judge Anderson comma.

SP:   Yes, yes.

RT:   Okay so you got that.  And then the bottom one or the second one said pleadings off to the top and then kinda at the bottom on the side was, ah, please notify Shannon in Security of any hearings where in Janet Delfuoco Goad will be in attendance and you saw that as well?

SP:   Correct.  It's in front of me as I speak.

RT:   Okay.  Um, having had a chance to review those, ah, I just wanna ask you a couple questions about them and what prompted you to actually prepare this document.  I, I, I would assume based on a telephone conversation you had with Janet Delfuoco the demeanor of the conversation is what prompted you to, to prepare this?

SP:   Correct.

RT:   Okay.

SP:   I, I found that the, ah, the hollering, the loudness, the directness, the topic of being her and taking quote unquote, you know people, talking about the judges the way she did.  Um, I just found that it was something that should not be taken lightly.  I put my desk phone on speaker so that my department could hear it as well, because she was a very hurt, um, let's see, ah, angry, angry woman.

RT:   Okay.

2

SP:   And I felt that a note should go in the file and go to my clerk, ah, in the event that anything should happen later with, with, ah, anybody in the court system involved in this case.

RT:   When you say, ah, she was, ah, vulgar, do you recall any words in particular that she may have used?

SP:   Oh gosh, um, vulgar. I-I know there were swears. I'm not sure if, if the, she. I'm, ah-I'm thinking that the F word, four letter F word did come out maybe once or more, I, but that would have been the word I used. That would have been the reason I used the word vulgar.

RT:   Okay. Um, and when you say the tone or the, or the loudness of it.

SP:   Yes.

RT:   It.

SP:   She, it was because she was so angry.

RT:   Yup.

SP:   And felt so hurt and that perhaps. Well the word corruption wh-came up many times that.

RT:   Right. But when you say loud, if you had to on a scale of one to ten and, you know, one being a, a normal conversation tone of voice.

SP:   Yes.

RT:   You know where would you, where would you rate, ah, Janet's voice that day?

SP:   Oh gee. She didn't let me interrupt. She just kept talking, I would say, I would say at least a nine, um. I don't think in all my years I've had, I've had such a conversation, um.

RT:   And that's what I wanted to ask you. So you, ah, I think before we went on record you told me you've been with the clerk's office for twenty six years?

SP:   Correct. Yes.

RT:   And so you've obviously talked to people on a regular basis.

SP:   Yes.

RT:   And.

000755

SP: As-as a matter of fact, um, my very first, um, six months here at, at, well in the court system in Rockingham which was located in Exeter, was the trial of the Pamela Smart murder and I was a receptionist and received a call from somebody who said, um, this is a bomb threat and.

RT: Ah-huh.

SP: And that was the reason that we had, um, after that we had meetings about what to do when this happens. And that man, ah, that, whoever made the call I should say was, mmm, on a scale of one to ten was a two.

RT: Okay.

SP: And this particular, ah, Janet was nine, nine and a half.

RT: Okay so and no one else, there's no other recollection of anyone being that angry that you've dealt with?

SP: Not that, no, because, um, well of course the civil department isn't, isn't as, you know hard core as criminal.

RT: Right.

SP: And I know criminals always say things in courtroom like oh, you know, I'll get you when I got out, that type of thing, um, she, she has been an angry person since her cases. She's got two or three I believe here. Since they were filed.

RT: Okay.

SP: And not happy person when they don't go her way.

RT: So just to clar

SP: At all.

RT: Just to clarify, um, because you're in the civil department, typically people don't get as angry as Janet would versus if, in criminal, in the criminal department of the clerk's office, they're, they probably deal with angry people on a more regular basis?

SP: Yes, yes. Hurt angry relatives perhaps of, you know, somebody that was incarcerated but, in, in the civil department, I mean you, you have a car accident and you make your complaint and, and then you have a trial or, or you cut the tree down on my, um, it was my property, um, I want the cost of that tree, that type of thing.

4

000756

RT:    Yeah.

SP:    But this, this was just something, this telephone conversation and I've had a couple of them with her, I know how to calm her down. In fact the ladies in my department will, I, I don't know if I've told them that just put her on hold and I'll take it or if I hear that they're on the phone with Janet, I will say why don't you give it to me. I can have a calming demeanor so to speak.

RT:    Hm, hm.

SP:    And I talk with her, not to her or above her because that makes her even more angry.

RT:    Okay. That day was she directing her anger towards anyone in particular?

SP:    Oh let me see, um, I think that was, eh, just let me look here. Well she, she specifically said Judge Weaver and Judge Anderson.

RT:    Right.

SP:    And I made sure that, um, Maureen my clerk knew about this and, and I believe that mentioned, it was mentioned or a copy given to Judge Weaver across the hall as well. But, um, she did mention, she did mention those judges specifically.

RT:    Okay. Anyone else, any other, was she up, angry with the clerk's office?

SP:    Oh let's see, um. Hm, my memory let's see. Hm. Hm, not, not that I can remember Richard, I, I just remember specifically the two judges and, and that they should have been warned, which is why I did the notice.

RT:    Okay. And that's it, that was another question, so you based on the tone, the anger, the vulgarity of the conversation.

SP:    Yes.

RT:    At, at the conclusion of it, you've, what steps did you take?

SP:    I immediately typed up, eh, as fast as I could verbatim.

RT:    Yup.

SP:    Um, of, well I shouldn't say verbatim, it wasn't word for word but the highlights.

RT:    Right.

SP:   And, um, like and I believe that a copy was. That I, I'd, I gave it to my clerk Maureen and then I believe she showed the two, the two judges that were involved and I left the note in the file so that. And-and when somebody comes to view a file if we have notes that should not go to the counter they come out prior to anybody looking at it. So, um, I typed up that notice fast as I could, gave it to my clerk and then she went on with that, and I-I think I did. Oh yes, yes, um. I, like I said I had my phone on speaker so that the other ladies could hear the, the anger in this person. And that's why I think after that I said if you get calls from her, give her to me. I will try to be as calming as I can.

RT:   Okay.

SP:   Yes.

RT:   Now that, when you say that notice is in the file, is that the one that, ah, it says please note-notify Shannon in security of any?

SP:   That notice is taped onto the front of the case, Richard, so that if we, if somebody pulls that off the shelf to work on it and schedule, that we notify Shannon downstairs in security that this person will be in the building and, we, that, that file does not get seen by her or by anybody else except the clerk and the judge in the courtroom.

RT:   Okay.

SP:   And when I, and when I mean the noticed I typed, it's the notice of April 29th, 2016, when I was concerned about her phone call.

RT:   Okay so, so that notice is in the file as well but it, it's only?

SP:   Yes.

RT:   See by court personnel?

SP:   Correct. And, and I do remember now that her anger was also towards the ex-husband, um. She mentioned the two judges, Weaver and Anderson and then had quite a conversation with me about her, her ex-husband.

RT:   Okay very good.

SP:   That's when she used the vulgarity.

RT:   Okay.

SP:   Yup.

6

RT:     So you think the vulgarity was directed more to her ex-husband?

SP:     I do.  I do think that, um, I just know the anger because sh, things didn't go her way, was at the judges, but the vulgarity of her conversation I think was more directed at the hus, ex-husband.

RT:     Okay.  Was there any other follow up done, any other steps taken, as a result of this?

SP:     I'm not sure if, um, I know security was notified.  I, the ladies here in the department know, um.  I'm not sure if it went out of that circle, in a circle of the food chain, you know, me to the.

RT:     Right.

SP:     To the deputy clerk to the clerk, I don't know where it went after that.

RT:     Okay.

SP:     But I do I know the judges were notified.  The two judges.

RT:     Now you said, um, you've had other conversations with, ah, Janet.

SP:     Yes.

RT:     But, ah, is this the one that you would describe as being, you know, the most anger, you know out of s?

SP:     Yes, because after that date I made sure that I tried to use a, like I said before, a, calming, um, if I had any calming nurture in it, in me at all I would make sure that I brought that to the surface.

RT:     Oh.

SP:     Just as soon as I picked up the phone I said hi Janet this is Sandy in the civil department, can I help you and you just know after a certain amount of time how to, how to handle people.

RT:     Right.

SP:     That they don't come to court for fun.

RT:     Hm.

SP:     And, this one certainly is not having any fun.

7

RT:     Right.  Okay, anything I didn't ask you that, um, I should?

SP:     Ah, not that I can think of, I, I'm, I'm glad that the, the judges know and my clerk know, the staff knows here, we have a note that if, if there's a hearing, um, I like that someone is notified about it, and, um, as a matter of fact she was in yesterday to file something in another case and just as quickly as she came in, ah, we said thank you and she left and no problems at all.

RT:     Okay.  Alright, well I'm gonna shut the recorder off, ah, Sandy, it's now 11:55 and I thank you for your time.

SP:     You're wel, very welcome, if you need anything else, don't hesitate.  I, I'm just a little short staffed in our department which is the reason I didn't quite get back to you so.

RT:     Okay.

SP:     Um, if you do need something Richard, just give me a call.

RT:     Okay, um, hold on one second, I'm gonna shut this off.

SP:     Sure.

End of Phone Interview
1671745
/mmp

8

000760

# EXHIBIT "G"

G-

## DELFUOCO Phone Interview

RT- Richard Tracy, Investigator

JD- Janet Delfuoco

## PART I

RT-  So Janet, I just gotta state the date and time and, uh, make sure that you understand I'm recording this. So, uh, today is March 16th, uh, 2016- uh 17, it is uh, 3:21 p.m. I'm at the office of the attorney general, and, uh, with me on the phone is Janet Delfuoco. And, Janet, you understand that the conversation is being recorded?

JD-  Yes, sir. I do.

RT-  Ok, you ok with that?

JD-  Yes, sir. I am.

RT-  ok, so you called and left me a...a voicemail message....

JD-  Yup.

RT-  ....and asked me to give you a call. Wh-what was that in reference to?

JD-  The reference is-is in- to a hearing that I had yesterday. Now, as you're more than aware of, you-you're more than aware of the on going issue I've had with my ex-husband, granite state credit union and the courts, correct? I mean this has been statewide, ongoing issues.

RT-  Yes.

JD-  I went to court yesterday at 9:00 a.m. I went in front of Judge Anderson, with my former husband, James Goads (Sp?). Because it was a status update about the sale of the property, 31 Mountain View Ave-his mobile home, and removing the lien off my house, 259 bow Street. Both properties are located in Northwood.

When we got into court Mr. Goads had already previously been ordered t-to show proof about any update that's been coming, you know, forthcoming with the house, the sale of the house, whatever. Mr. Goads then had absolutely nothing with him except a piece of paper that he gave to me *and* the judge.

After reviewing the paper, um, me and the judge both didn't understand the terminology of the paper, which was a credit report from Equinox and what it said is that on 2-20..., 2-17, yeah-2-22-17, that Granite State Credit loan, that Mr. Goads had removed the equity loan, has been removed from Granite State Credit Union and has been turned over to what they call "charged off." I didn't understand what "charged off" meant, Judge Anderson had no clue what "charged off" meant. We both looked at each other, questioned Mr. Goads about it. Mr. Goads proceeded to try to re-con and scam me by saying to the Judge that the loan was no longer on my house, and no longer there and it was nobody's responsibility.

Judge Anderson then started to proceed to question Mr. Goads about what it meant and alls he kept saying was "It's no longer there, it's no longer there, ya know, I-I-I should have to pay her more money." The whole nine yards. This went on for ten straight minutes. Judge Anderson then proceeded to say "Ms. Delfuoco, what do you think?" and I'm like, "I don't believe any of this." I'm like, "Because I haven't heard anything from the bank," and I says, "Even though I'm not under legal obligation, I have been notified by you, more than once, that this bank is supposed to notify me of any turn of events, which they never have!"

So, then, I got a little curious about it. I came home. I dealt with personal issues. I tried to go-log on to the records of deeds in-in-in Rockingham County to see if it had been removed. I couldn't get on. I went into Rockingham County the deeds and then I found that the Granite State Credit Union, without my knowledge, had-had submitted, uh, like a subordination paper, which means that their equity loan was gonna always be second to my first mortgage; which was pretty much just saying "we're gonna keep charging you fines and fees but were not gonna ever foreclose on the house because of the wealth."

RT-  Ok.

JD-  so with that being said, I did more research and I found out what the terminology to the paper Mr. Goads handed over; which meant it was *turned over to a collection agency*. So now there's even more legal fees that have been attached to my home. I contacted Granite State Credit Union <u>three times yesterday</u> and they refused to talk to me. They kept referring me ta- um- Mr. Gallant. Now I have court order that Mr. Gallant and Granite State Credit Union are supposed to stay in touch with me about everything that goes on! Which they have not! And I have also have gone to the Banking Commissioner about this, who I have on tape! With me! Frank Edleblut! Granite State Credit U--- um, with the Banking Commissioner and their attorney, saying that everything that Judge Anderson, and Clifford Gallant and Granite State Credit Union is doing is illegal. Ok?!

RT-  Yup. I hear you.

JD-  ok, well, I heard a beep so I didn't know if....

RT- no, no no…

JD- …yup, ok.

RT- …I'm-I'm still here.

JD- So, alright. Great.

So, that was a whole entire hour of fighting with the banking commissioner, saying all of this. I take my butt back down to the Court house. I file an emergency ex parte order to talk to the judge because 30…31 Mountain View Ave., is supposedly supposed to be being sold within two weeks.

RT- Is-is and that, uh Janet, just so I'm clear, Mountain View Ave. is, uh, James Goads…

JD- Is the mobile home park…

RT- …yup…

JD- …That Mr. Goads used to reside at…

RT- Ok.

JD- …yes.

So with those proceeds all loans are supposed to be paid off and cleared up off the debt. Now, Mr. Goads was trying to get out of it in court by telling the Judge he was keeping all the proceeds, that there was no more loan, he didn't need to pay me. This is all recorded at court. You can see this.

Anyways, I go back into court. I file an ex parte order to- to speak to the judge immediately. To tell the judge that he's- he's trying to scam me! yet again! Trying to scam me! And that he lied to the court to a pease himself to try to physically scam me yet again out of more money and paying off the loan.

So, while I'm waiting to hear on the ex parte order if Judge Anderson will speak with me, I proceed to go downstairs to the lower level of Rockingham Superior Courthouse in Brentwood and I speak with the Prosecutor's Office- who then puts me in charge with a prosecutor. He comes out I tell him I want to press charges against Mr. Goads because of what he just tried to do.

He says to me "This is not our concern we can't do anything until the police actually file a formal complaint, and then we investigate and then we shall press charges." I say, "What police department?" He says, "Brentwood."

So what do I do? I go back upstairs in the main lobby. I dial 9-1-1. I call the police. Brentwood police- very, very fast responding. Sent an officer over. To walk into the courtroom with me, so they can hear the Judge's, you know, testimony saying that he was more than aware that Mr. Gode had lied, and that, you know, everything I was saying true and I wanted to press charges. The judge turns around and says to me, "No. You can't press charges against him." I said, "Why not?" He says, "Because I didn't put him under oath. He's allowed to lie."

RT-    umh.

JD-    So then, the officer is just standing there going, "ok, uh, is this like really for real, the guy handed in falsified documentation, lied, and your saying she can't press charges?" and the judge is like, "That's right. She cannot press charges. He was not under oath. He's allowed to lie." So then....

RT-    Oooh...ok...

JD-    ...the police officer and me went outside...

RT-    ....yup...yup...

JD-    ...we started talking some more. He looked over the stuff that Mr. Gode gave me. He goes, "who told you to call us?" Because he even called his chief and the detective...

(inaudible noise)

...of Brentwood Police Department and they're like, "Yeah, obviously you can't press charges if he isn't under oath..." he's like, "and that's not even our jurisdiction. And whoever is telling her this is lying to her because they should all know better. Its Rockingham County Sheriff's Department that shoulda responded to this, not us."

So the officer looked at me and says, "Who told you to call us to press charges?" and I said, "The Prosecutor's Office, downstairs." He says, "Let's go."

So, we go downstairs and he says to the office person, he goes, "I want to talk to whoever just told her to call us and to press charges." And-and, the...apparently now, everybody is making phone calls through the whole building, because now he calls in-into the officer, in to private. Wouldn't even talk in front of me. He says, "I need to speak to you privately." And walks in and I can hear them talking, saying, "yeah, there's nothing we can do and we wouldn't do anything anyways," and he says, "Besides none of it was under oath."

RT-    Ok.

JD-   Do you understand, wh- can you shut this off now, because now I just want to get down-right rude.

RT-   (laughs) Uh, you want me to shut the recording off Janet?

JD-   If you don't mind because now I'm just gonna to get down-right nasty and when we start talkin' and I prefer that nobody to really hear this. Because I'm really B.S-ing about this.

RT-   Ok. Alright. Ho-hold on a second and let me, uh…

JD-   I'll always admit to sayin' what I say. One thing I do not do in this world…

RT-   …Janet….Janet…

JD-   …is lie. I have no need to lie.

RT-   …Janet….Let me shut the recorder off. Hold on.


**PART II**

RT-   ok, so, uh, we're back on recording. Its, uh, 3:32. We were off for about two minutes so Janet could vent a little bit. But Janet, I wanted to ask you- when we talked a couple weeks ago, um, it was about…a couple message.

JD-   …Facebook page…

RT-   …right…

JD-   ….message that I wrote. Yup.

RT-   Yup. And, I, uh, I believe it was Sunday, February 9th, um that you had posted those messages. And what-what prompted you to post those messages that we were talking about?

JD-   The emotional issues that I'm having…with nobody following the laws in the State of New Hampshire from the Banking Commissioner knowing that criminal acts are taking place in the State, a judge who's not following the laws- protecting a criminal, and a bank who's also not following judge's orders, along with an attorney. Whose name is Clifford Gallant.

RT-   Ok. And, um, in there… But they were only up for a couple days. Why did you take it down on the 7th?

JD-   I don't know. I don't know. I-I-I think I just put it up there 'cause I was just angry…

RT-   yup…

JD-   and then everybody was like "you really, probably shouldn't do that, you know everybody's watching you, we all know what's going on and don't worry everybody will get their justice."

RT-   Oh, so people told you that maybe it-it wouldn't be appropriate to have them up there?

JD-   Oh they know, they know what I'm going through. Everybody in the whole world knows what I'm going through.

I'm doing an international interview, Saturday night, for uh…um…what's the name of that radio program…Children Live in Hell. This woman reached out for me from the Netherlands and Saturday night I'm doing an international, over the phone, radio interview with her that's gonna go worldwide about everything I've gone through right down to the Banking Commissioner physically trying to assault me, chasing me through his office, down two flights of stairs and through a parking lot until I got to my truck and locked myself in the truck and took off.

RT-   Did you report…

JD-   Frank Edleblut watching the whole entire thing.

RT-   Did you report that to anybody?

JD-   I told the state police what happened because the Banking Commissioner tried to have me arrested because I recorded this.

RT-   So di…

JD-   And I have it on tape with him saying that what the judge and Granite State Credit Union is doing is all criminal acts.

RT-   Janet, did-did the State Police take a report, do you know?

JD-   No. They didn't. He just told me… he threatened me. He says, "Don't you dare ever play that tape or you'll be arrested." That's what I got told.

RT-   Oh, ok. So he didn't threaten to harm you, he threatened that if you- if you…play that tape, uh.. he's gonna…

JD-   That's what the State Police said. Not, not, not, um, the Banking Commissioner, he was gonna, he was trying to assault me. I was runnin' away from him.

RT-   Did- did he physically assault you?

JD-   No, because I was too fast. I got away from him. He couldn't catch me.

RT-   Ok. And wh-what did the, uh, Banking Commissioner say to you?

JD-   He just started screaming at me, telling me to "stop, stop, stop it." He wanted the tape.

RT-   Alright.

JD-   And then he was screaming through the whole building, "Someone stop her! Call the cops! Call the cops! Stop her!" And he-he-he chased me, right out the building and right through the parking lot. And then when I got out to the parking lot I started calling Kimberly Rice, who's a state rep. I called Joe Albertrino, who's a friend of mine and then I also talked to Erin Day. As I was trying to squeal away and hide from this crazy man.

RT-   so...uh...

JD-   This is all prompt from the equity loan that was take out on my house and nobody anything about it except makin' me suffer.

RT-   No. i- I know, its uh...its ah....

JD-   so you wanted this on tape so I'm tellin' you what...

RT-   ...No..

JD-   ...it's from...

RT-   ...No... I...yes...

JD-   ...an illegal loan that was taken out on my house.

RT-   I appre- I appreciate you clarifying that for me. I just wanted to make sure that we got it right. And that it...it..it deals with that $36,100.00 loan, correct?

JD-   Yes sir.

RT-   And that, Mr. Goads, was supposed to, in addition to paying the loan, he was supposed to pay you...what was it, fi-

JD-   $500.00 a month until the loan was taken off my house.

RT-   and what was...

JD-   The loan was only supposed to be on my house for less than one year. But when Mr. Goads went to the bank, he falsified the application-

RT-   Right...

JD- -by telling the bank that he lived in those, this house. Which he never did.

RT- ok, so-

JD- This whole thing has just gotten out of hand because then I end up losing my son. I started to lose the house. I mean, it's just gotten out of hand. And it hasn't stopped! How many years later? This all began in August of 2012. I lost my son April 13th of 2013. And it hasn't stopped. I've been back and forth to court a million times because of him. I'm out on bail! I was physically arrested because he took a job literally right across the street from my house just to harass me! And then when I complained to the manager, two hours later, in front of my son, I was arrested! I'm out on bail!

RT- What were you charged with?

JD- I was charged with breaking a restraining order because I complained to the gas station manager that when I walked in there every time and he was there that he was taunting me!

RT- And, and has that been settled in court yet?

JD- No! I go to court in May. I have trial in May. They tried to settle it out of court with me and I refused!

RT- Do you have an attorney with that?

JD- Nope!

RT- Ok. Hey Janet, can I just ask you about those Facebook, uh, can you remind me again, when you wrote "the judges and that fucking attorney are so next! So, so next!" What did you mean by that?

JD- It means that I'm a practicing witch and I'm gonna (inaudible) curse (inaudible)

RT- Janet, you broke up a little bit. You said you're "a practicing witch"...

JD- and I'm gonna (inaudible)

RT- Are you moving around or something? Cause you keep breaking up on me.

Janet?

Janet?

Alright.

**PART III**

RT-    Uh, so its 3:39, we lost connection for a minute or so, and Janet, you understand that I'm recording the conversation? Correct?

JD-    Yup.

RT-    Ok. So, you started to explain the judges, and that when you made statement, "the judges and that fucking attorney are so next! So, so next!" I heard, "because I'm a practicing witch" but then you- you broke up.

JD-    I said because I'm a practicing witch, I'm very good with voodoo and bringing back into reality what people do to do me, they get back.

RT-    ...back...

JD-    It's called "an eye for an eye" in the old Italian bible.

RT-    ok. And on the second post when you wrote, "Donald. Dead."

JD-    That's my uncle. Donald Mills...

RT-    Yup.

JD-    He died la-uh-this past summer.

RT-    Mother lost it all....

JD-    Huh?

RT-    Then you wrote "mother lost it all. Diane..."

JD-    ...Yes she did and my step-father got wicked sick. She lost her house and now they're living in Florida away from my son. I did all of it to them because I want them away from my oldest son because while they're poisoning him and lying to the courts during my custody battle, they've never even met my kid.

RT-    Wh-

JD-    Never even met him! My mother had no idea who my oldest son was until m-y ex-husband promised them, "oh, I'm gonna bring Spencer right into your life and make yous all happy. Alls you have to do is testify against her."

My mother was a drunk when I was growing up. I didn't even live with her. I lived with my father.

RT-    And-

JD-   I had no contact with this woman and all of a sudden, my ex-husband is turning around, introducing they-them to my kid and then they come in into court and testify against me. Oh no, they'd all got what they've deserved.

And my sister right now, is sick as a dog, had to take time off of from work and her husband has to have a heart surgery.

RT-   Is that…

JD-   (inaudible)

RT-   …Diane?

JD-   Everything they all deserve…

RT-   Janet, is that Diane?

JD-   Yup.

RT-   And, um, so Diane, your mother, your step-father, they all testified against you in the custody hearing?

JD-   Yup.

RT-   And then you-

JD-   Yup. My, my aunt did, my aunt did. My Uncle's wife did it, my sister did it and I think my mom did it. I told my mother to stay away from my kid and she laughed at me. She goes, "Ha, ha, your losing out." She laughed at me. So, you know what? I cursed them. I cursed all of 'em.

RT-   Ok…a-

JD-   I don't care. I'm proud of it. I'm proud of it.

RT-   And… and what about the third post? "As my aunt just me are you really going to be able to live with yourself with all the pain your causing your family. My response was 'yup. …

JD-   Yup.

RT-   …Let them all die and suffer. Hear that, Diane? Suffer.'"

JD-   That's right. Suffer.

RT-   Ok.

JD-  Suffer for testifying against me and lying in court saying that I'm a bad mother. She didn't even know my kids. She hasn't even met them. She never even met my youngest. She still hasn't met him. I won't even let that psycho anywhere near my kid.

My sister has split personality disorder and she's bi-polar.

RT-  How abo-

JD-  She's in and out of mental institutes. I didn't even grow up in the same house with her. I don't even know her. And yet my ex-husband called up all of my family sayin', "She's going down. She's havin' a nervous breakdown. She's doing this."

After, you know what; I never came out and told anyone why me and my ex-husband split up. You wanna hear why we split up? Now that it's on tape? I'll tell you why. First of all, he only married me 'cause he got me pregnant 'cause he thought I was coming into millions of dollars from a former accident I had. When that money didn't pan out he left me for a richer woman over in Bow. But before he left me, my grandmother moved in with me.

My grandfather, god rest his soul, just passed away January 5th. My grandmother came up here to live with me and you can check with Concord Hospital, this all happened. They gave her a wrong drug combination and in the middle of the night one night when I was at work taking care of someone else's grandmother, my grandmother got out of bed and begged him to call me or an ambulance 'cause he-she started bleeding out to death.

RT-  Oh, I'm sor-

JD-  You know what he did?! He told her to go back to bed and he never told me! She died!

RT-  Oh, I'm sorry to hear th-

JD-  She freakin' died! Did you hear that?!

RT-  I-I-I-

JD-  She Died!

RT-  I can, I can hear you, Janet.

Janet, when you said, "Next is Weaver, Anderson and Gallant. I will give you the shirt off my back and heal your diseases but I'm also just as capable of killing you off. Don't ever cross me with corruption and greed." What did you mean by that?

JD-  It means that Weaver took my kid away just like Senator Avard did in the interview. He had no right taking my kid under all those false pretenses. None of those judges check

anything or listened to anything my witnesses had to say. Jim had no witnesses except three people who hadn't even met me or my kids.

So, you know what? What comes around, goes around. And I hope Weaver's kids suffers just as badly as he just made my kids all suffer. Because my two boys, have very little contact now because of it. He split up my boys. He split them up.

RT-   Don't they go to school together?

JD-   So what?

RT-   yeah...

JD-   They're not allowed to hang around together. They only go to the same school. He split up my boys! My boys were best friends growing up and he split them up because of greed!

RT-   alright.

JD-   Because of my ex-husband's greed. Because he wanted nothing more than to not stop paying child support. He didn't want to pay child support ever again. And that was his motion over and over again. "I shouldn't have to pay. I got one. She's got one." I- it's all about money with my ex, and you people don't get it. It's all about money. He does not care whose lives he destroys. But he does it for the money.

You think I'm the only woman he's done this to? He did this to three other women. Two of them testified in court saying, "He did this to me too. Exactly what he's doing to her, he did to me."

RT-   Hey, Janet...

JD-   The Judge wouldn't listen! He wouldn't listen!

RT-   Well, that's... I'm sorry to hear that, Janet. we- let me as-

JD-   Go on, go on Speak Up New-

RT-   No. No...

JD-   Hampshire... With Kevin Avard. You know who Senator Kevin Avard is, right?

RT-   yup. I saw-

JD-   Then why don't you watch the video? Kevin Avard said it the best.

RT-   I-I did...wa...

JD-   (inaudible) he said it the best.

RT-   I did see the video. I did see the video.

JD-   Then you already know what I've been through.

RT-   Yup.

JD-   I have a house. My house. I'm gonna lose that house. I built that house. I had both my boys in that house. My dogs are all buried in the back yard of that house and god damn it, my grandmother died in that house. The woman who raised me died in that house. And I'm losing it because not on fricken person in this State will protect me or my rights 'cause you're all too busy being corrupt protecting a god damn fake...

RT-   Ja-

JD-   And a con.

RT-   Janet, who, who told you that it wasn't a good idea to keep those posts up?

JD-   I don't know. I don't remember.

RT-   Alright. But, ho-did- was it-

JD-   Who cares? It was posts. Did anything happen to them yet? You don't even know.

RT-   Ok.

JD-   When it does, you call me and you tell me so I can mark it on my wall.

RT-   And how will you mark, what do you mean mark it on your wall?

JD-   I don't know I'll put it on Facebook. Look, if-if, the greed finally got even.

RT-   Ok.

JD-   So I got even with the evil.

RT-   So was it-

JD-   That's all I'm gonna say. The light got even with the evil. You know as well as I do what comes around, goes around in this world and if you pray hard enough, it usually happens and I'm pretty god damn good at prayin'.

RT-   Was it more than one person that suggested you remove the post from your wall?

JD-   I don't remember.

RT-   Alright.

JD-   I don't remember. You're asking me dumb questions about somthin' that I've already forgotten about 'cause I'm too angry about what happened yesterday.

RT-   Alright, well, regarding yesterday, I'll give, uh, Attorney Gallant and or Tracey a call to see if I can find out what's going on.

JD-   Yeah, I'd like to know what's gonna go on with this Judge Anderson character, who keeps letting this con get away with lyin'. That's what I'd like to know ahe-

RT-   Well-

JD-   I'd like to know why I get arrested for being under my amendments to be able to complain about the way I'm being treated in a store that is literally across the street from my house and yet, I get arrested and he walks.

RT-   Janet, it-

JD-   Are the people in, in this State really that fricken crazy?!

RT-   It might be true that because there's, he, he wasn't under oath that he can't, he can't be charged with perjury.

JD-   Well, what kind of idiot Judge brings someone in and doesn't put them under oath when he knows he's lied? He's caught him in more lies than imaginable. This guy is a professional con artist.

RT-   Are you put under oath every time you, you get up and stand in front of the Judge and talk about the situation?

JD-   No, because the Judge knows I got nothin' to lie about. I haven't lied yet about anything. I have nothin' to hide. What do I got to hide? I didn't do anything wrong. I admitted to walking in there complainin' to the damn manager. I coulda denied the whole thing, but I didn't. And I was arrested and now I will go face my charges.

RT-   Alright.

JD-   and then I will also have a video taped to share it with the whole rest of the world that is watching this whole entire case.

RT-   Did you video tape, uh, yesterday's hearing?

JD-   No. Do you know that's the only hearing I have never taped. But if yougo on my Facebook page there is the most recent hearing after that where I, I, I yelled at the judge

again because Jim was pulling, trying to pull off the same thing. It's on my page. It's open to the public. You're more than welcome to listen to it.

RT-    Uh…

JD-    Check out my page. (Laughs) I really don't care. I don't care.

RT-    Alright.

JD-    I'm losing everything. Do you seriously think after losing a friggen child and uh, losing my house and dividing my boys up for life that I'm gonna sit back and just care? No. I am not gonna care.

RT-    Ok. Um, Janet, is there anything else you think I should know?

JD-    I think you already know the whole damn story. The question is is what are you gonna do about it?

RT-    Alright, well let, first I'm gonna, I'm gonna start out by calling attorney gallant and or Tracy at the Granite State Credit Union and see if I can find out what's going on with the sale of, uh-

JD-    By the way, I'm also trying to sue Granite State Credit Union and I have Judge Anderson lying on three different accounts on his decision on why my case is being thrown out. Three different accounts why I can't. Lies. I had three different attorneys look at me and say, "this is all lies. He can't do this." So when it reaches the Supreme Court, because I am gonna go to the Supreme Court with this, I'm gonna ask that Federal charges be brought up against that judge and against the State for allowing it to happen. You guys are more than aware of how corrupt all these judges are and none of yous, none of yous have been doing any kind of investigation against these people. They're only attorneys. They're not gods. They're attorneys. That were appointed into a position that they have overruled with too much power. That's all they are. They're nobodies. And you're letting them destroy lives.

RT-    Hey, Janet, do you remember, um, y-you took the post down, did those, those three comments, did you put it back up for another brief time and then take-

JD-    Nope.

RT-    No? It was-

JD-    I haven't said anything since that rant. Listen, I just like to rant and rave once and a while. Ok? Instead of going to the bar and picking up a drink or smoking a joint and doing drugs. If anybody wants to get me for ranting and raving once and a while, then be my guest. But at least I'm not doing anything else.

RT-    Ok.

JD-    You all can't handle the fact that I'm a mother here that's already lost everything and I'm full of emotion. Too god damn bad. Seriously, too god damn bad.

RT-    Alright.

JD-    Because you lose everything and then you tell me how it feels. Tell me how it feels after you've lost everything. I worked for everything I have and I worked freaking hard and I worked harder than people because I have degenerative disk disease (sobs) and my boy fights me every single day and I still have been able to maintain a beautiful house with at least one great son. So you let me know how it feels to be in my shoes, 'cause you know what? I think you'd go kill yourself after a week of dealing with what I have to deal with pain-wise.

RT-    Alright.

JD-    And I still get up and go to work every day and I still take my kid, my son just became a United States Navy Cadet. Let me tell how many other single moms can pull that off with their kid.

RT-    Well that's good. I'm glad to hear that. You should be proud of that.

       Um, Janet, anything else before we, uh, cut this off?

JD-    Nope. I'm fine. You got any more questions for me? (laughs) (inaudible)

RT-    no.

JD-    You're the one who's more interested in what I'm capable of doing.

RT-    well, uh, th-I have, I gotta be honest with you, I got concerns if you're, you know, if you're thinking of causing our judges or attorney Gallant any harm.

JD-    Well, I can wish whatever I want. There's no laws against it. I'm allowed to. Until you all come up with practicing witchcraft laws, I'm not breaking any laws. And you know what? Maybe they shouldn't be wishing me harm, because that's what they're doing to me.

RT-    Ok. Alright, Janet.

JD-    They are all wishing me harm.

RT-    Alright. Ok to give you a call if I do have any other questions?

JD-    You know you can. My lines always open.

RT-    Alright, are you going to work tonight or did you work today?

JD-    I already got out of work. I'm all done for the day.

RT-    Ok. Alright. And, uh, your son, does he have any uh, last time, I think we talked you said he's into motorcycle racing, obvious-

JD-    He's a dirt bike racer. He's a Boy Scout working on his Eagle Badge. He's a Northwood Firefighter Explorer. And he just became a United States Navy Sea Cadet.

RT-    That's good. You should be-

JD-    Not bad. Huh?

RT-    No, you should be very proud of that. What's his uh, doesn't Eagle Scouts, don't they have to come up with some kind of, uh, big project?

JD-    Yup.

RT-    What's he wanna do?

JD-    I have no idea. We haven't any idea yet. We'll figure it out. I'm sure we're gonna do something for the veterans of this country.

RT-    Yeah, alright. Ok. I'll, uh, give you a call if I hear anything from Granite State Credit Union and, uh, or if I have any questions. Ok?

JD-    Ok.

RT-    Alright, Janet. I'm gonna shut the recorder off.

# EXHIBIT "H"



 **Belknap** Dental Associates

40 CHESTNUT STREE
SUITE 2
DOVER, NH 03820
(603) 742-4735
FAX (603) 742-9911
www.belknapdental.c

July 14, 2016

Re Patient: Janet Delfuco
DOB: 02.19.1967

To Whom It May Concern:

Janet presented in this office on July 13, 2016 for her oral hygiene visit. Patient had fractured tooth #3.
Full coverage crown recommended.

Wear was noted from grinding and clenching teeth. Occlusal guard has only been recommended.

Sincerely,

Jyoti Thapa, D.D.S.

000457

DEPARTMENT | FAMILY MEDICINE AT PILLSBURY

Concord NH 03301-3549
Phone: 603-224-7575
Fax: 603-228-7255

Janet M Delfuoco
259 Bow St
Northwood NH 03261-4116

March 31, 2016

To Whom it May Concern:

I am the primary care physician for Ms. Janet Delfuoco. She has been under my care for more than 15 years.

Ms. Delfuoco suffers from a number of pain related medical disorders, including fibromyalgia, recurring headaches, neck pain and back pain.

Ms. Delfuoco has been involved in a legal issue that has been extremely stressful for her. Over the last several months she has exhibited stress related symptoms including severe insomnia, elevated blood pressure and weight gain. These symptoms can be directly attributable to her stress. She has also experience exacerbation of her chronic pain issues. Stress is well known to aggravate the diffuse pain of fibromyalgia and her neck pain is increased by muscular tension, another symptom of stress.

Anything that could be done to reduce Ms. Delfuoco's stress will help reduce her pain, and I would ask that you assist her in any way possible.

Sincerely,

ELIZABETH A SANDERS, MD
Family Medicine At Pillsbury
2 Pillsbury St, Suite 401
Concord NH 03301-3549
Phone: 603-224-7575
Fax: 603-228-7255

EXHIBIT "I"



# DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco  RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | January 11, 2018 |

hello stalker, i'm doing fine,
thanks for checking up on me.

**Photo Id:** 10211770471954199
**Posted** 2017-01-25 18:22:32UTC
**Status**
**Mobile** true



**Photo Id:** 10211770355591290
**Posted** 2017-01-25 14:32:23 UTC
**Status**
**Mobile** true

Page 113

| Page | of | pages | SIGNED | DATE |
|---|---|---|---|---|
| $\partial^3 0$ | $^{1}/3$ | | | $1-11-2015$ |

### DEPARTMENT OF JUSTICE
### OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco<br>RSA 631:4-a - Harms or Threats to<br>Certain Government Officials | Richard C. Tracy | January 11, 2018 |

**Comments User** Clutch Hinson (603658828)
**Text** If ever I did an act of vandalism, especially involving symbols associated with hate crime, the last thing I would do is document it on my facebook profile and admit doing it
**Time** 2017-02-03 23:10:01 UTC

**User** Janet Delfuoco (1140904087)
**Text** Its in my back yard...i can hardly denie it and i wouldnt anyways....
**Time** 2017-02-03 23:13:58 UTC

**User** Janet Delfuoco (1140904087)
**Text** The one thing I dont do....is lie or steal or cheat...oh thats three things# sorry my mistake
**Time** 2017-02-03 23:14:40 UTC

Page 393

hello stalker i'm doing fine,
thanks for checking up on me.

Page 394



| Page | of | pages | SIGNED | DATE |
|---|---|---|---|---|
| 65 | 112 | | | 1-11-2018 |

000854

## DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
## CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter #<br>2017:23748 | Case Name<br>State v. Janet Delfuoco<br>RSA 631:4-a - Harms or Threats to<br>Certain Government Officials | Investigator<br>Richard C. Tracy | Report Date<br>January 11, 2018 |
|---|---|---|---|

I am pretty sure I will be going to hell in every religion.

**Photo Id:** 10211713647053612
**Posted** 2017-01-20 23:45:48 UTC
**Status**
**Mobile** true

**Page 114**



Life has never given me lemons...

It has given me anger issues, anxiety, a love for alcohol, and a serious dislike for stupid people. But not lemons.

**Photo Id:** 10211708446523602
**Posted** 2017-01-20 03:22:27 UTC
**Status** @[100002167030860:2048:Eric Raadmae]....aint you glad your a new englander...lol
**Mobile** true

Page  21  of  113  pages  SIGNED  _____  DATE  1 - 11 - 2018

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**CONTINUATION OF INVESTIGATION/ARREST REPORT**

| Matter # 2017123748 | Case Name State v. Janet Delfuoco RSA 631:4-a - Harms or Threats to Certain Government Officials | Investigator Richard C. Tracy | Report Date January 11, 2018 |
|---|---|---|---|

Page 395

I'm sorry I
called you
an Asshole,
I thought
you knew

Page 399

I am pretty sure I
will be going to hell
in every religion.

Page 400



"Life" has never given me lemons...

It has given me anger issues, anxiety,
a love for alcohol, and a serious dislike
for stupid people. But not lemons.

Page ___ of ___ pages   SIGNED ___   DATE 1-11-2018

# DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | January 11, 2018 |

Page 93



Photo Id: 10211858439793340
Posted 2017-02-04 02:30:33 UTC
Status So @[1259853937:2048:Dianne Lyons]....i have been saving this one....so my ex is in contempt twice tells the judge he never recieved a date and walks. ....mike goes throygh the exact same thing and is arrested....COURT CORRUPTION....
Mobile true
Posted 2017-02-03 23:30:08 UTC
Status
Mobile true
Posted 2017-02-03 23:20:18 UTC
Status Im not backing down because Im not alone.
Mobile true
Posted 2017-02-02 12:39:56 UTC
Status
Mobile true

Page 8 of 113 pages   SIGNED             DATE 1-11-2018

# DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco | Richard C. Tracy | January 11, 2018 |
| | RSA 631:4-a - Harms or Threats to Certain Government Officials | | |

Page 377-378



Photo Id: 10211858439793340
Posted 2017-02-04 02:30:33 UTC
Status So @[1259853937:2048:Dianne Lyons]....i have been saving this one....so my ex is in contempt twice tells the judge he never recieved a date and walks. ....mike goes tbroygh the exact same thing and is arrested....COURT CORRUPTION....
Mobile true

Posted 2017-02-03 23:30:08 UTC
Status
Mobile true

Posted 2017-02-03 23:20:18 UTC
Status Im not backing down because Im not alone.
Mobile true

Posted 2017-02-03 21:52:53 UTC
Status Vandalism at its best....
Mobile true

Page 69 of 113 pages SIGNED _____ DATE 1-11-2018

# EXHIBIT "J"

**Story**
    Janet Delfuoco shared NEVER NEVER NEVER GIVE UP!!!'s photo.
**Message** Most couldnt handle my life...

**Time** 2017-03-08 17:38:37 UTC
**Story** Janet Delfuoco added 2 new photos — with Troy Samoisette.
**Message** Well he did it....so hes getting that brand new dirt bike

**Time** 2017-03-07 23:42:03 UTC
**Message** Thank you Christine Nicholson!! Passed inspection...thank your hubby for me.

**Time** 2017-03-07 15:19:44 UTC
**Story** Janet Delfuoco shared Tournament Guy's video.
**Message** Steven Prescott....heres the video.

**Time** 2017-03-07 15:16:05 UTC
**Story** Janet Delfuoco shared a memory.
**Message** I love this pic of me and sam...

**Time** 2017-03-07 13:29:55 UTC
**Message** I could live with this prediction. ...

**Time** 2017-03-07 13:05:29 UTC
**Story** Janet Delfuoco likes Free Jasmijn from Court Ordered Abduction.

**Time** 2017-03-07 13:03:08 UTC
**Message** Christine Nicholson...check your messages i need your help....

**Time** 2017-03-06 18:53:12 UTC
**Message** Ed Bryans Eva Marie Mavrofrides Stilkey Erica Rae Dianne Lyons

**Time** 2017-03-06 03:46:25 UTC
**Message** thanks for accepting honey still don't have the use of messenger yet a few more days
    :-)

**Time** 2017-03-06 01:57:35 UTC
**Story** Janet Delfuoco and ThomasJoseph Rucano are now friends.

**Time** 2017-03-06 01:56:29 UTC
**Story** Janet Delfuoco and Geerte Frenken are now friends.

**Time** 2017-03-05 23:46:43 UTC
**Story** Janet Delfuoco shared Jerome Hudson's post.
**Message** Thats right....

**Time** 2017-03-05 22:23:59 UTC
**Story** Janet Delfuoco likes Dream Barns LLC.

**Time** 2017-03-04 19:19:42 UTC
**Story** Janet Delfuoco shared Juliette Hibbert's post.

**Time** 2017-03-03 02:03:03 UTC
**Message** Laura Godin....road trip!!!

**Time** 2017-03-03 00:50:24 UTC
**Message** No matter how disciplined my son is....He has still managed to perfect the art of " Im
    a teenage asshole personality."

000938

**Time** 2017-03-02 00:11:12 UTC

**Mobile**

true



**Photo Id:** 10212226821082642
**Posted** 2017-03-14 00:56:34 UTC
**Status** @[592064588:2048:Laura Godin]
**Mobile** true
**Comments**                    **User** Laura Godin (592064588)
                               **Text** Dancing bears and moose tours your the only one crazy enough to
                               do these things with me.
                               **Time** 2017-03-14 00:59:41 UTC

**Posted** 2017-03-13 18:46:38 UTC
**Status** So true#new england tough!
**Mobile** true



00949

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**CONTINUATION OF INVESTIGATION/ARREST REPORT**

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco | Richard C. Tracy | January 11, 2018 |
| | RSA 631:4-a - Harms or Threats to | | |
| | Certain Government Officials | | |

# You can't continue to hurt good people and believe God is OK with your actions

# TIMETOPUTKIDSFIRST.ORG



Photo Id: 10211802366111533
Posted 2017-01-29 14:19:32 UTC
Status @[592064588:2048:Laura Godin]...your good morning...
Mobile true
Comments User Laura Godin (592064588)
Text I love it!!
Time 2017-01-29 14:57:03 UTC


Photo Id: 10211779056728813

| Page | of | pages | SIGNED | DATE |
|---|---|---|---|---|
| 19 | 113 | | | 1-11-2018 |

# DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|----------|-----------|--------------|-------------|
| 2017123748 | State v. Janet Delfuoco RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | January 11, 2018 |

**Page 80**



**Photo Id:** 10211966280329286
**Posted** 2017-02-16 01:17:13 UTC
**Status**
**Mobile** true

**Page 88**

**Posted** 2017-02-11 11:41:06 UTC
**Status** Well I guess someone cant handle the truth.
**Mobile** true
**Posted** 2017-02-10 22:10:52 UTC
**Status** And what comes around goes around
**Mobile** true
**Posted** 2017-02-10 15:00:41 UTC
**Status** @[1520141352:2048:Eva Marie Mavrofrides Stilkey]....the whole story by senator kevin Avard. Still fighting for my house against a corrupt bank.
https://youtu.be/oCINKFXgz-4
**Mobile** true

Page ___/ 6___ of ___/ 13___ pages  SIGNED _____  DATE 1-11-2018

DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter #<br>2017123748 | Case Name<br>State v. Janet Delfuoco<br>RSA 631:4-a - Harms or Threats to<br>Certain Government Officials | Investigator<br>Richard C. Tracy | Report Date<br>January 11, 2018 |
| --- | --- | --- | --- |



Photo Id: 10212034876284142
Posted 2017-02-23 16:32:22 UTC
Status
Mobile true

Page 73



Posted 2017-02-17 19:23:26 UTC
Status So freaking true
Mobile true
Posted 2017-02-16 13:20:26 UTC
Status I want this...
Mobile true

| Page | of | pages | SIGNED | DATE |
| --- | --- | --- | --- | --- |
| /5 | 113 | | | 1-11-2018 |

000804

# DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco | Richard C. Tracy | January 11, 2018 |
| | RSA 631:4-a - Harms or Threats to | | |
| | Certain Government Officials | | |

mom. I honestly think you should consider Law school. There are grants out there for single moms. I just turned 61 yrs young and finished my Bachelor's in Behavioral Science 3yrs ago. My interest is children's rights in family court and in custody issues. Anyway, thanks for your courage. Sigrid from NH

**Mobile** true

**Comments User** Janet Delfuoco (1140904087)

**Text** You do not need an attorney! ! You can fight all on your own.

**Time** 2017-02-28 14:53:19 UTC

**Page 63**



**Posted** 2017-02-23 16:33:44 UTC

**Status** I name a hell of alot more then six...even the contractor at work just got one hell of an ear full to the point he just cut the price in half.

**Mobile** true

**Photo Id:**

**Page 72**

Page ___ of ___ pages | SIGNED ___        DATE 1-11-2018

## DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
## CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco | Richard C. Tracy | January 11, 2018 |
| | RSA 631:4-a - Harms or Threats to | | |
| | Certain Government Officials | | |



**Recipients** Geerte Frenken (100008263446879)
Janet Delfuoco (1140904087)
**Author** Janet Delfuoco (1140904087)
**Sent** 2017-03-15 23:47:55 UTC
**IP** 71.168.76.37
**Deleted** false
**Body** the above one was the last time I spent time with him, feb of 2013...

### Pages 345-349

**Recipients** Geerte Frenken (100008263446879) Janet Delfuoco (1140904087)
**Author** Janet Delfuoco (1140904087)
**Sent** 2017-03-15 23:59:29 UTC
**IP** 71.168.76.37
**Deleted** false
**Body** And i cant be that bad of a parent if my son i have custody of is a fire
explorer and a navy cadet.

**Recipients** Janet Delfuoco (1140904087) Geerte Frenken (100008263446879)
**Author** Geerte Frenken (100008263446879)
**Sent** 2017-03-16 11:25:00 UTC
**Deleted** false
**Body** Thank you Janet! Of course you are not a bad parent. We know who the bad
parent is in this story and you're doing a great job exposing it all. The last thing a
sociopath wants is being exposed. Goes for that bank too!

Page 59 of 118 pages SIGNED _____ DATE 1-11-2018

## DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL
## CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco | Richard C. Tracy | January 11, 2018 |
| | RSA 631:4-a - Harms or Threats to | | |
| | Certain Government Officials | | |



**Photo Id:** 10211913015877708
**Comments User** Janet Deifuoco (1140904087)
**Text** So next week I get to do a finish up show/ talk on what happened since and its not pretty....but if people can learn from my mistakes and pain then I will expose all.
**Time** 2017-02-19 17:19:26 UTC

Page 91



**Photo Id:** 10211899175971719
**Posted** 2017-02-08 21:27:05 UTC
**Status** Has anyone ever wondered that maybe I post stuff and say stuff to screw with your tiny idiotic brain.....lol :)
**Mobile** true
**Comments User** Janet Delfuoco (1140904087)
**Text** Now Eric.....I know you laughing at me right now.
**Time** 2017-02-08 21:37:07 UTC

**Posted** 2017-02-08 13:04:34 UTC
**Status** Who ever is "monitoring" my Facebook. ...since you understand my stress level think you can get me a massage for my birthday... :) and for your little brain....the ag's office really doesnt care that Im a witch.....bajahahaha...get a life loser.
**Mobile** true
**Comments User** Janet Delfuoco (1140904087)
**Text**
And I was laughing as i was giving them the list of accomplished curses ...lol. You could be next.
　　　**Time** 2017-02-08 17:38:23 UTC

| Page | of | pages | SIGNED | DATE |
|---|---|---|---|---|
| 17 | 113 | | | 1-11-2018 |

Facebook Legal Request date of birth

**Date Of Birth** 02/19/1967



**Photo Id:** 10212026792162044
**Posted** 2017-02-22 12:17:35 UTC
**Status**
**Mobile** true

000978

# EXHIBIT "K"

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**CONTINUATION OF INVESTIGATION/ARREST REPORT**

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | December 5, 2017 |

On December 1, 2017, Prosecuting Attorney Erin E. Fitzgerald and I discussed obtaining the subscriber information for IP address: 71.168.81.210.  Attorney Fitzgerald issued a Subpoena Duces Tecum to:

Fairpoint Communications, Inc.
521 E. Morehead Street, Suite 250
Charlotte, NC 28202

The subpoena was sent via email to fairpoint@netd-ttp.com

On December 4, 2017 at 1838 hours, I received an email from fairpoint@netd-ttp.com with the following documents attached.

1. Correspondence from John Hernandez Authorized Agent for Custodian of Records, Fairpoint Communications.

2. John Hernandez's declaration that he is the custodian of records for Fairpoint Communication, Inc.

3. Subscriber information for IP address 71.168.81.210:

   a. Subscriber:         Janet Delfuoco, 259 Bow St. Northwood, NH 03261
   b. Email address:      janet@myfairpoint.net
   c. Length of Service:  1/20/2012

4. February 5, 2017 usage history for IP address: 71.168.81.210

5. Copy of Attorney Fitzgerald's subpoena.

| Page | of | pages | SIGNED | DATE |
|---|---|---|---|---|
| 1 | | 1 | | 12-5-17 |

001534



YAANA TECHNOLOGIES
542 Gibraltar Drive
Milpitas, CA 95035 USA

**Bridging the Future**

December 4, 2017

Fairpoint Communications
Control #6847-FACO

We are a designated agent of Fairpoint Communica6ions authorized to respond to subpoenas, search warrants, and court orders for the production of customer and call detail records.  We conducted a search of Fairpoint Communications records in response to the lawful process you issued to Fairpoint Communications dated December 4, 2017. This letter is to advise you that the following records are enclosed in response to the attached request:

### Customer Records

X  Subscriber Information

X  IP Addresses

### Description of Records

| Target Details | Comments | Date: | Time: |
|---|---|---|---|
| 71.168.81 210 | | 2/05/2017 | 00:00 – 23:59 EDT |

Please contact John Hernandez at (408) 834-3405 between the hours of 9am-5pm PST.  When calling, please reference the control number #6847 to enable us to retrieve the subpoena and letter from our files for the contact.

Sincerely,

*[signature]*

John Hernandez
Authorized Agent for Custodian of Records
Fairpoint Communications



YAANA TECHNOLOGIES
542 Gibraltar Drive
Milpitas, CA 95035 USA

...Bridging the Future

## DECLARATION OF CUSTODIAN OF RECORDS

Pursuant to 28 U.S.C. § 1746, I, the undersigned do hereby declare:

1. I am acting on behalf of the Custodian of Records for Fairpoint Communications. I am authorized to submit this declaration on behalf of Fairpoint Communications. I make this declaration pursuant to Federal Rules of Evidence 803 (6) (Records of regularly conducted activity) and 902 (11) (Certified domestic records or regularly conducted activity), in response to the request issued on December 4, 2017.

2. The documents attached hereto are true and correct copies of data that were made at or near the time of occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters in this business;

3. The documents attached hereto were kept in the ordinary course of the regularly conducted activity in this business;

4. The documents attached hereto were made by the regularly conducted activity as a regular practice in this business.

I declare that the foregoing statements made are true. I am aware that if any of the foregoing statements made are willfully false, I am subject to punishment.

Executed: 12/4/2017

John Hernandez
Authorized Agent for Custodian of Records

www.yaanatech.com

001536



YAANA TECHNOLOGIES
542 Gibraltar Drive
Milpitas, CA 95035 USA

...Bridging the Future

## 6847-FACO-Subscriber Information Printout

| | |
|---|---|
| Target: | 71.168.81.210 |
| First Name: | Janet |
| Last Name: | DelFuoco |
| Address: | 259 Bow St |
| City: | Northwood |
| State: | NH |
| Zip Code: | 03261 |
| Telephone Number: | |
| Email Address: | janet@myfairpoint.net |
| Account Number: | |
| Length of Service: | 1/30/2012 |

www.yaanatech.com

001537

| DATE | TIME | RAS_CLIENT | FULL_NAME | RECORD_TYPE | USER_NAME |
|------|------|-----------|-----------|-------------|-----------|
| 07/05/2017 | 05:15:19 | CNCDNH-MNCHNHCO-ERXG02-VOL | janet@myfairpoint.net | Interim | janet@myfairpoint.net |
| 02/05/2017 | 11:15:19 | CNCDNH-MNCHNHCO-ERXG02-VOL | janet@myfairpoint.net | Interim | janet@myfairpoint.net |
| 02/05/2017 | 17:15:19 | CNCDNH-MNCHNHCO-ERXG02-VOL | janet@myfairpoint.net | Interim | janet@myfairpoint.net |
| 02/05/2017 | 23:15:19 | CNCDNH-MNCHNHCO-ERXG02-VOL | janet@myfairpoint.net | Interim | janet@myfairpoint.net |

001538

| AUTH_TYPE | NAS_IP_ADDRESS | NAS_PORT | SERVICE_TYPE | FRAMED_PROTOCOL | FRAMED_IP_ADDRESS | FILTER_ID |
|---|---|---|---|---|---|---|
| 200 | 64.222.166.11 | 587333943 | 2 | 1 | 71.168.81.210 | |
| 200 | 64.222.166.11 | 587333943 | 2 | 1 | 71.168.81.210 | |
| 200 | 64.222.166.11 | 587333943 | 2 | 1 | 71.168.81.210 | |
| 200 | 64.222.166.11 | 587333943 | 2 | 1 | 71.168.81.210 | |

001539

| ACCT_INPUT_OCTETS | ACCT_OUTPUT_OCTETS | ACCT_SESSION_ID | ACCT_SESSION TIME |
|---|---|---|---|
| | | CNCDNH-MNCHNHCO-ERXG02-VOL | 3 |
| | | CNCDNH-MNCHNHCO-ERXG02-VOL | 3 |
| | | CNCDNH-MNCHNHCO-ERXG02-VOL | 3 |
| | | CNCDNH-MNCHNHCO-ERXG02-VOL | 3 |

001540

| ACCT_TERMINATION_CAUSE | NAS_PORT_ID | NAS_PORT_TYPE | DataSource |
|---|---|---|---|
| 0 | 2548812 | 0067813453 | INTRNT |
| 0 | 2570412 | 0067813453 | INTRNT |
| 0 | 2592012 | 0067813453 | INTRNT |
| 0 | 2613612 | 0067813453 | INTRNT |

001541

**ATTORNEY GENERAL**
**DEPARTMENT OF JUSTICE**
33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

GORDON J. MacDONALD
ATTORNEY GENERAL



ANN M. RICE
DEPUTY ATTORNEY GENERAL

December 4, 2017

VIA EMAIL: fairpoint@netd-ttp.com

Fairpoint Communications, Inc.
521 E. Morehead Street, Suite 250
Charlotte, NC 28202

Re:    **EXPEDITED REQUEST: Enclosed Subpoena Duces Tecum for Telephone**
**Records**

    Enclosed please find a subpoena for subscriber records for the following IP address:
**71.168.81.210.** We are looking for this information in relation to a criminal investigation.

    The enclosed grand jury subpoena requires your appearance before the Rockingham
County Grand Jury on **January 4, 2018,** to produce subscriber records identified in the
subpoena. However, compliance with the subpoena through your appearance before the grand
jury is not necessary if you will voluntarily provide the requested records to the attention of the
State's agent, Chief Investigator Richard Tracy, of the New Hampshire Department of Justice via
email at **richard.c.tracy@doj.nh.gov.**

Your assistance in expediting this information is much appreciated. **DISCLOSURE**
**COULD IMPEDE THIS CRIMINAL INVESTIGATION. PLEASE DO NOT NOTIFY**
**THE SUBSCRIBER.**

               Sincerely,

               Erin E. Fitzgerald
               Attorney, Office of the Attorney General (N.H.)
               (603) 271-3671

Enclosure

# THE STATE OF NEW HAMPSHIRE

ROCKINGHAM, SS.

## Subpoena Duces Tecum

To: Fairpoint Communications, Inc.
521 E. Morehead Street, Suite 250
Charlotte, NC 28202

You are required to produce the following original records to the Rockingham County Grand Jury at the Rockingham County Superior Court in Brentwood said county, on the 4th day of January, 2018, relating to an investigation being conducted by the grand jury:

Any and all account information, subscriber information, associated email or phone information, customer name and address, payment information, account set up information, and IP logs related to the following IP address: **71.168.81.210**

from 00:00 EDT 02/05/2017 until 23:59 EDT on 02/05/2017.

Hereof fail not, as you will answer your default under penalties prescribed by law.

Dated at CONCORD, N.H., on December 4, 2017.

Justice of the Peace/Notary Public

**ANNIE M. GAGNE**
My Commission Expires: **Justice of the Peace - New Hampshire**
**My Commission Expires March 9, 2021**

*Report to the Rockingham County Grand Jury, Brentwood, New Hampshire.
*Direct any questions to Erin Fitzgerald, Attorney, 33 Capitol Street, Concord, New Hampshire 03301. Telephone (603) 271-3671.

STATE OF NEW HAMPSHIRE
MERRIMACK, SS.
I hereby certify that I have served the foregoing on Fairpoint Communications by emailing a copy to fairpoint@netd-tpp.com on December 4, 2017.

Erin E. Fitzgerald
Attorney
Criminal Justice Bureau
Office of the Attorney General
33 Capitol Street
Concord, NH 03101

# EXHIBIT "L"



THE STATE OF NEW HAMPSHIRE

6th CIRCUIT – DISTRICT DIVISION – CONCORD

MERRIMACK, SS                                                          MARCH 2017

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

*(Janet Delfuoco / Facebook)*

## INTRODUCTION

I, Investigator Richard C. Tracy, being duly sworn, depose and say:

1. I am employed as an Investigator with the Attorney General's Office ("AGO") for the State of New Hampshire. I have been employed in my present position since 2007. Prior to that I was employed by the Manchester Police Department as a police officer and graduated from the full time NH Police Academy in 1980. My duties and responsibilities as an investigator include the investigation of crimes that occur in the State of New Hampshire. I have participated in the investigation of fraud cases, thefts, public integrity crimes, sexual assaults, assaults, embezzlement, and other serious crimes.

2. I am conducting the investigation in this matter. In the course of my investigation, I have interviewed pertinent witnesses, including the target, Janet Delfuoco. I have also reviewed Delfuoco's Facebook page and the relevant audio and video clips that she and others have posted on the Internet. In addition, I have reviewed certain relevant correspondence from the Granite State Credit Union's to Delfuoco, and court pleadings filed and orders issued in the 10th Circuit—Family Division—Brentwood and the Rockingham County Superior Court.

3. As explained below, based on this investigation, there is probable cause to believe that Janet Delfuoco, date of birth 2/19/67, of 259 Bow Street in Northwood, has committed the crime of **Harm or Threats to Certain Government Officials**, in violation of **RSA 631:4-a, II**, and that evidence of this crime exists and will be found in the possession of Facebook, Inc.

4. Accordingly, I request that a warrant be issued authorizing the search of Facebook. I know that Facebook owns and operates a free-access social networking website that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts, and users can use these accounts to share written news, comments, photographs, videos and other information with other Facebook users or the general public.

## EVIDENCE IN SUPPORT OF PROBABLE CAUSE

5. On February 7, 2017, I received information that Janet Delfuoco had posted three concerning statements on her Facebook page. I received a screenshot copy of the statements, and subsequently learned that the statements had been posted on Sunday, February 5, 2017, all within a short period of time. The statements are as follows (punctuation, capitalization, and ellipses as in the original; underlining added):

> *Post #1*— the judges and that fucking attorney are so next … so so next

> *Post #2*—Donald.. dead, mother lost it all, Diane sick, husband sick…. next is weaver, Anderson, and gallant i will give you the shirt off my back and heal your diseases. but i am also just as capable of killing you off …… don't ever cross me with corruption and greed.

> *Post #3*—As my aunt just asked me…. are you really going to be able to live with yourself with all the pain you are causing your family…my response was yep, let them all die and suffer….hear that Diane…suffer!

6. I have learned that Janet Delfuoco has been involved in litigation in the 10th Circuit—Family Division—Brentwood and the Rockingham County Superior Court. Further, I have reviewed audio and video content posted online, in which Delfuoco discusses these matters and alleges that the judges in her cases are corrupt and have unfairly and improperly taken sides against her.

7. Based on my interviews with relevant witnesses, my review of certain correspondence and court documents, and my review of relevant audio and video content posted on the Internet, I am aware that Delfuoco's family court case (618-2010-DM-00064) appears to have begun in or around 2010 as a matter involving her separation, then divorce, from her now ex-husband James Goad. In or around 2013 or 2014, the focus of the litigation appears to have turned to the parenting of Delfuoco and Goad's two sons. The Honorable Mark F. Weaver presided over these parenting matters, which appear to have been contentious.

8. The Honorable David A. Anderson presides or presided over the matters in which Delfuoco is or was involved in the superior court. There are at least three such matters: Delfuoco's suit against Goad (218-2014-CV-1145), Granite State Credit Union's ("GSCU") suit against Delfuoco and her counterclaim against GSCU (218-2016-CV-00060), and Delfuoco's suit against GSCU (218-2016-CV-01140).

9. I am aware that Clifford P. Gallant, Jr., an attorney with the Manchester firm of Beliveau, Fredette & Gallant, represents GSCU in these matters. GSCU's suit against Delfuoco sought an injunction preventing her from slandering the credit union. Judge Anderson denied that claim.

10. According to information obtained from documents I reviewed, interviews I conducted, and relevant audio and video clips posted on the Internet, all the superior court matters concern a $36,100 home equity loan which Delfuoco co-signed with in 2012, using Delfuoco's home[1] at 259 Bow Street in Northwood as collateral. At that time, though legally separated, Goad and Delfuoco's relationship was amicable and the parties intended the home equity loan to finance Goad's purchase of a nearby manufactured home.

11. The superior court litigation appears to have commenced when Delfuoco and Goad's relationship became strained and she sued Goad over reimbursement for the loan. The litigation with GSCU involved Delfuoco's belief—despite her acknowledgment that she had signed the home equity mortgage document—that her signature was forged on at least two mortgage documents, that Goad had made fraudulent representations in the home equity loan paperwork, and that GSCU had engaged in predatory lending.

12. On February 17, 2016, Judge Anderson issued a written ruling denying Delfuoco's request for an order increasing the amount of Goad's reimbursement payments to her. On May 23, 2016, Judge Anderson issued a written ruling dismissing Delfuoco's counterclaim against GSCU, in which she alleged that the credit union had committed the crimes of forgery and theft, engaged in fraud, and intentionally inflicted emotional distress on her. On February 2, 2017, Judge Anderson dismissed Delfuoco's suit against GSCU, in which she made claims similar to those made in her counter-suit.

13. I conducted a telephonic interview of Janet Delfuoco on February 7, 2017. When I advised her that I wanted to speak with her about some of her recent Facebook posts, she blurted out, "Under the freedom of speech, I can say what I want."

14. Delfuoco admitted that she had posted each of the three statements. She said that she was "so fucking angry" at Judge Anderson when his most recent order came out. She said she was angry at Judge Weaver because as a result of his order that she could not initiate contact with her older teenaged son, who lives with Goad, Goad recently tried to have her arrested when her son contacted her. Delfuoco was agitated throughout the majority of our conversation. During the conversation, she raised her tone of voice and ranted about Anderson, Weaver, Goad, Gallant, and GSCU.

15. Delfuoco claimed to be a practicing witch and said that the threats contained in her statements were not threats of physical harm but threats of a witchcraft curse which would lead to the cursed person's death.

16. On February 9, 2017, I conducted a telephonic interview of Judge Anderson. Anderson told me that he was very familiar with Delfuoco and the litigation involving

---

[1] It is unclear whether Delfuoco held title to the home in 2012, or whether she and Goad owned the home jointly. Delfuoco apparently maintains that the home belonged solely to her at the time she signed the home equity loan paperwork.

Goad and GSCU. Anderson said that Delfuoco's behavior was "inconsistent," but she appeared to be growing more frustrated and angry. Judge Anderson had been alerted to Delfuoco's Facebook posts by a friend who is an attorney who had received it from an attorney friend of Attorney Gallant's. On February 6, 2017, Judge Anderson forwarded the screen shot of the posts to court security staff.

17. Anderson said that he had "some concern" over the posts because although he knew Defuoco had a tendency to get "very upset," the tone of these Facebook posts seemed "different," causing him to conclude that they could be "read ... as being threatening."

18. Also on February 9, 2017, I conducted a telephone interview of Judge Weaver. He too was very familiar with Delfuoco. In June 2015, as the result of Delfuoco having "lost control of herself" in his courtroom, Weaver had issued an order finding that she had serious anger issues and ordering her to engage in anger management counseling.

19. Weaver spoke with Anderson about the Facebook posts and made sure that court security staff had been notified. Weaver had previously seen threatening Facebook posts by Delfuoco against Goad because he had filed copies of them during the parenting litigation. Because Delfuoco had threatened Goad for years and never acted on the threats, Weaver did not feel "personally threatened" by the Facebook threats at issue. Nonetheless, he wanted to ensure that security was notified because, he said, "I could be wrong."

20. I am aware that court security staff met with Weaver and Anderson on Tuesday, February 7, 2017, to discuss Delfuoco's Facebook posts. They advised the judges to review court security procedures and discuss "action plans" with their families.

21. I also conducted a telephonic interview on February 9, 2017, with Jody Ducharme, who is GSCU's marketing manager. Because Delfuoco had been posting disparaging and "aggressive" comments about GSCU on her Facebook page, Ducharme began to monitor Delfuoco's Facebook page about a year ago, often checking it several times a day.

22. Ducharme suspected that Delfuoco would be angered by Anderson's February 2, 2017 order dismissing her suit against GSCU. Ducharme checked Delfuoco's Facebook page over the course of the next few days, but did not see any reference to the matter. When Ducharme checked on Sunday, February 2, however, she found the three statements at issue. Ducharme took screen shots of each of the posts and forwarded them to a supervisor, who sent them to Gallant.

23. Ducharme noticed on Tuesday, February 7, 2017, that the Facebook posts had been removed from Delfuoco's Facebook page and that the posts were back up for a brief time on Wednesday, February 8, 2017, before being taken down for the second time.

24. Ducharme believed that Delfuoco may have known her Facebook page was being monitored. Ducharme recalled that a year ago, Delfuoco had posted on her Facebook page, "Hello stalker, I'm doing fine," and that Delfuoco had reposted this statement on January 25, 2017.

25. Ducharme noted that on February 8, 2017, Delfuoco posted a message that indicates Delfuoco knows that someone is monitoring her Facebook page, "Whoever is "monitoring" my Facebook. ...since you understand my stress level think you can get me a message for my birthday..."

## CONCLUSION

26. Based on the foregoing, there is probable cause to believe that Janet Delfuoco has committed the crime of **Harm or Threats to Certain Government Officials**, in violation of **RSA 631:4-a, II**, and that she has done so using Facebook.

27. RSA 631:4-a, II provides in relevant part that:

> A person is guilty of a class B felony if he or she threatens bodily injury or threatens to commit any other crime against a ... member of the judiciary ... in retaliation for action taken as a part of an official's government duties.

28. Based on the foregoing, there is probable cause to believe that the Facebook Account belonging to Janet Delfuoco, user name "https://facebook.com/janet.delfuoco" will contain evidence of the crime of Harm or Threats to Certain Government Officials.

29. I submit that this affidavit supports probable cause for a warrant to search the Facebook Account of Janet Delfuoco, user name "https://facebook.com/janet.delfuoco" to seize the information described below.

## COMPLIANCE WITH WARRANT

30. I know that Facebook's corporate headquarters are located at 1601 S. Willow Ave, Menlo Park, CA 94025.

31. I am aware of Cal. Pen. Code § 1524.2 governing "electronic communication services" and "remote computing services" like Facebook. I am aware that Cal. Pen Code § 1524.2(b)(1) serves as a "long-arm" statute and states:

> When properly served with a search warrant issued by the California court, a foreign corporation subject to this section shall provide to the applicant, all records sought pursuant to that warrant within five business days of receipt, including those records maintained or located outside this state.

32. Likewise, I am aware that under Cal. Pen Code § 1524.2(c), a California corporation that provides "electronic communication services" must comply with a warrant issued by another state. Specifically, Cal. Pen Code § 1524.2(c) states:

> A California corporation that provides electronic communication services or remote computing services to the general public, when served with a warrant issued by another state to produce records that would reveal the identity of the customers using those services, data stored by, or on behalf of, the customer, the customer's usage of those services, the recipient or destination of communications sent to or from those customers, or the content of those communications, shall produce those records as if that warrant had been issued by a California court.

33. In addition, I am aware that Facebook maintains an agent for service of process in New Hampshire which is located at Lawyers Incorporating Service, 10 Ferry Street S313, Concord, NH.

## EVIDENCE SOUGHT

34. The evidence I seek in the Facebook account of Janet Delfuoco, user name "https://facebook.com/janet.delfuoco" is evidence of the crime of Harm or Threats to Certain Government Officials, per RSA 631:4-a, II, including, but not limited to:

- User(s) full name(s), full URL to Facebook profile(s), birth date(s), known e-mail address(es), phone number(s), address(es), ID or IP address(es);

- Neoprint ID and information, Photoprint ID and information, Neoselect information;

- Any activity and content associated with the account(s), including but not limited to date and time stamp of account creation date, login history, private messaging including content (sent and received), mini-feed, status update history, shares, notes, wall postings, timeline posts, location information, friend listing with friends Facebook ID(s), group listing with Facebook ID(s), future and past events, video posts, with filename, user photos, group information, private messages, chat logs and IP logs for the following time period:

    c  January 18, 2017 to present.

I respectfully request that this Court issue a warrant and order authorizing the search of the Facebook account belonging to of Janet Delfuoco, "https://facebook.com/janet.delfuoco" described above.

.

000784

_____

Investigator Richard Tracy

STATE OF NEW HAMPSHIRE
MERRIMACK, SS

Then personally appeared the above-named, **Investigator Richard Tracy**, and made oath that the factual allegations contained in the above affidavit are true to the best of her knowledge and belief.

Sworn to before me by **Richard Tracy** on _3-16-2017_ at approximately _10:37AM_

_____

Justice

Edward M. Gordon

Date:  _3-16-2017_

000785



THE STATE OF NEW HAMPSHIRE

6th CIRCUIT – DISTRICT DIVISION - CONCORD

MERRIMACK, SS                                                    MARCH 2017

**\*\*FILED UNDER SEAL\*\***

IN RE: APPLICATION FOR A SEARCH WARRANT
*(YouTube)*

**AFFIDAVIT OF RICHARD TRACY**

I, Richard C. Tracy, being duly sworn hereby depose and say:

1.  I am employed as an Investigator with the Attorney General's Office ("AGO") for the State of New Hampshire. I have been employed in my present position since 2007. Prior to that I was employed by the Manchester Police Department as a police officer and graduated from the full time NH Police Academy in 1980. My duties and responsibilities as an investigator include the investigation of crimes that occur in the State of New Hampshire. I have participated in the investigation of fraud cases, thefts, public integrity crimes, sexual assaults, assaults, embezzlement, and other serious crimes.

2.  I am conducting the investigation in this matter. In the course of my investigation, I have interviewed pertinent witnesses, including the target, Janet Delfuoco. I have also reviewed Delfuoco's Facebook page and the relevant audio and video clips that she and others have posted on the Internet. In addition, I have reviewed certain relevant correspondence from the Granite State Credit Union's to Delfuoco, and court pleadings filed and orders issued in the 10th Circuit—Family Division—Brentwood and the Rockingham County Superior Court.

3.  I am currently investigating Janet Delfuoco for violations of RSA 631:4-a, II, concerning criminal threats against two New Hampshire judges. Violations of this statute are class B felonies.

4.  I am seeking a warrant to obtain evidence from YouTube of Janet Delfuoco's crimes. I am aware that it is YouTube's policy to notify the account-holder when YouTube's receives legal process requesting an account-holder's records. The accounts included in the search warrant are YouTube accounts established by Janet Delfuoco and by individuals Delfuoco has enlisted in her campaign against the judges she has threatened.

5.  I have attempted to conceal this investigation from the target of the investigation. Based on my training and experience, I know that premature disclosure of an

investigation can often seriously jeopardize the investigation by giving potential suspects the opportunity to flee, to destroy and/or tamper with evidence, and to intimidate potential witnesses.

6. I am aware that Janet Delfuoco has displayed volatile, irrational behavior in the past. I am further aware that Janet Delfuoco has removed material relevant to the instant investigation from her Facebook account, presumably in an attempt to preclude its use as evidence. Finally, I am aware that Janet Delfuoco has enlisted other individuals in her campaign against the judges she has threatened, and that those individuals have posted on You Tube material relevant to the instant criminal investigation.

I hereby swear that the foregoing is true and correct based on information and belief.

Richard C. Tracy, Investigator
Attorney General's Office
Criminal Justice Bureau

Subscribed to and sworn before me this 16th day of March 2017

6th ~~11th~~ Circuit – District Division – Candia

Edward M. Gordon

001746

# APPLICATION FOR SEARCH WARRANT and SUPPORTING AFFIDAVIT

(This application and affidavit to be detached by Justice issuing warrant and
filed separately with the court to which the warrant is returnable.)

**Instructions:** A person seeking a search warrant shall appear personally before any justice, associate justice or special justice of the municipal, district or superior court and shall give an affidavit in substantially the form hereinafter prescribed. The affidavit shall contain facts, information, and circumstances upon which such person relies to establish probable cause for the issuance of the warrant and the affidavit may be supplemented by oral statements under oath for the establishment of probable cause. The person issuing the warrant shall retain the affidavit and shall make notes personally of the substance of any oral statements under oath supplementing the affidavit or arrange for a transcript to be made of such oral statements. The person issuing the search warrant shall deliver the affidavit and the notes or transcript within three days after the issuance of the warrant to the court to which the warrant is returnable. Upon the return of said warrant, the affidavit and the notes or transcript shall be attached to it and shall be filed therewith, and they shall be a public document when the warrant is returned, unless otherwise ordered by a court of record.

## THE STATE OF NEW HAMPSHIRE

MERRIMACK , SS
(county)

6th CIRCUIT -CONCORD Court

March 16 2017
(Month / Day) (Year)

I, _____ Chief Investigator Richard C. Tracy _____ Being duly sworn, depose and say:
(Name of applicant)

1. I am _____ the Chief Investigator for the New Hampshire Attorney General's Office _____
(describe position, assignment, office, etc.)

2. I have information, based upon: PLEASE SEE ATTACHED AFFIDAVIT
(describe source, facts indicating reliability and credibility of source and  nature of information; if based on personal knowledge, so state)

(Use this additional sheet for Item No. 2, if necessary)

3. Based upon the foregoing information (and upon my personal knowledge) there is probable cause to believe that the
(strike out if not applicable)

Property hereinafter described  is evidence of the crime of harms or threats to certain government officials, contrary to RSA 631:4a
(has been stolen, etc.)

And may be found in the possession of YouTube a Google Company.
(in the possession of A.B. or any other person)

At premises Of YouTube a Google Company, 1600 Amphitheatre Parkway, Mountain View, CA 94043

4. The property for which I seek the issuance of a search warrant is the following:
(here described the property as particularly as possible)

Please refer to next page for details

Wherefore, I request that the court issue a warrant and order of seizure, authorizing the search of,

YouTube a Google Company, 1600 Amphitheatre Parkway, Mountain View, CA 94043
(identify premises and the persons to be searched)

and directing that if such property or evidence or any part thereof be found that it be seized and brought before the court;

together with such other and further relief that the court may deem proper.

_____
(Name)

Then personally appeared the above named          Chief Investigator Richard C. Tracy

and made oath that the foregoing affidavit by him subscribed is true.

Before me this        16th        Day of _____ March, 2017
(Day)                                              (Month / Year)

Justice of the  6TH CIRCUIT  Court

(Court seal) 001748

(Use this additional sheet for Item No. 8, if necessary)

1. The evidence I seek in the possession of You Tube, which is evidence of the crime of Harm or Threats to Certain Government Officials, per RSA 631:4-a, II, is the following:

   - A video described as *Speak Up! Janet Delfuoco*, published on YouTube on December 1, 2015, at https://www.youtube.com/watch?v=oCINKFXgz-4, and any comments, descriptions, or any other text appearing in conjunction with this video.

   - Audio described as *SOC Week 4 Broadcast Recording*, published on December 14, 2015, at https://www.youtube.com/watch?v_wobI1noNur3I&t=223s, and any comments, descriptions, or any other text appearing in conjunction with this video.

   - A video described as *Janet vs granite state credit union for pre trial*, published on April 7, 2016, at https://www.youtube.com/watch?v=ayesX9uHXQ&t=1074s, and any comments, descriptions, or any other text appearing in conjunction with this video.

   - A video described as *Matt Connarton Unleashed (4/13/16) w/ Jon Hopwood and Janet Delfuoco*, published on April 13, 2016, at https://www.youtube.com/watch?v=1NawxsxkZ-k, and any comments, descriptions, or any other text appearing in conjunction with this video.

   - A video described as *Questions about judicial reform in nh with mayor Ted Gatsas*, published on June 12, 2016, at https://www.youtube.com/watch?v_JqFp4_4Quic, and any comments, descriptions, or any other text appearing in conjunction with this video.

   - A video described as *Sununu*, published on June 14, 2016, at https://www.youtube.com/watch?v_TX9a1jDrwwg, and any comments, descriptions, or any other text appearing in conjunction with this video.

   - A video described as *Judicial corruption and reform series intro*, published on August 30, 2016, at https://www.youtube.com/watch?v_nxyDnJM4ue4. Delfuoco complains that the New Hampshire judicial system is corrupt, and any comments, descriptions, or any other text appearing in conjunction with this video.

Justice of the 6th CIRCUIT Court

(Court 001749

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**CONTINUATION OF INVESTIGATION/ARREST REPORT**

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet DELFUOCO RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | February 9, 2017 |

February 7, 2017, I left a message with who I believe to be Janet DELFUOCO's son requesting that DELFUOCO contact me. DELFUOCO returned my call later that afternoon. The reason for contacting DELFUOCO was to set up a date and time that we could meet in order to discuss the Facebook postings in this matter. In lieu of setting up an interview, DELFUOCO began to speak freely about the Facebook postings and why she posted them. AAG Lisa Wolford was present in the office when DELFUOCO returned my call. I asked DELFUOCO if I could put my phone on speaker informing DELFUOCO that AAG Wolford was present. DELFUOCO asked who that was, I replied that it was the attorney assigned to this investigation.

Janet DELFUOCO, 2/19/67
259 Bow Street
Northwood, NH 03261
(603) 942-5187 & cell (603) 608-8391
Employed as a hospice care nurse.

I explained to DELFUOCO that I wanted to speak with her about some Facebook postings DELFUOCO posted this past Sunday which we are concerned with. DELFUOCO blurted out "under the freedom of speech I can say what I want".

I asked DELFUOCO if there was any chance I could meet with her tomorrow (2/8/17). DELFUOCO stated that she couldn't meet tomorrow as her blood pressure was 150 over 100 because of this situation and that she was going to the doctors, I suggested that she might consider going to her Doctor today, which DELFUOCO replied that she couldn't go today because she was working a double shift as her relief was not able to come in.

Throughout the majority of our conversation it was clear from the tone and the raising of her voice that DELFUOCO was agitated as she often went on rants about various dealings with Granite State Credit Union (GSCU), Attorney GALLANT, Judge ANDERSON, Judge WEAVER and the Banking Department.

DELFUOCO stated that we should look at Banking Commissioner LITTLE and the banking attorney who chased DELFUOCO and State Representative Frank EDELBUT out of the banking office and into the parking lot after they learned that DELFUOCO had recorded the conversation that the four of them had in the banking office. DELFUOCO stated that she would have her son email me a transcript of her conversation with Commissioner LITTLE and his attorney.

| Page | of | pages | SIGNED | DATE |
|---|---|---|---|---|
| 1 | 3 | | | 2-23-17 |

001656

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**CONTINUATION OF INVESTIGATION/ARREST REPORT**

| Matter # | Case Name | Investigator | Report Date |
|----------|-----------|--------------|-------------|
| 2017123748 | State v. Janet DELFUOCO RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | February 9, 2017 |

DELFUOCO feels strongly that the GSCU should be held responsible for not doing their due diligence prior to giving her ex-husband Jim GOAD a loan to purchase a mobile home. DELFUOCO acknowledged that she signed the last page of the loan paperwork allowing her home to be used as collateral for GOAD's loan. She is upset that Judge ANDERSON told her that he will not hold GSCU responsible for the actions of her ex-husband Jim GOAD. DELFUOCO at one point stated "I am so angry with Judge ANDERSON". Later in the conversation when ranting about Judge ANDERSON'S decision DELFUOCO blurted out "I was so fucking angry".

DELFUOCO was asked to explain why would she be so angry with Judge WEAVER now, when the custody hearing was a few years ago. DELFUOCO responded that her son recently tried to contact her, which resulted in her ex, GOAD, trying to have DELFUOCO arrested.

I asked DELFUOCO what she meant by the following Facebook posting "the judges and that fucking attorney are so next.....so so next." DELFUOCO explained that she is a "practicing witch" that she would not kill someone but will cast a curse on someone which will ultimately lead to their death. DELFUOCO suggested that we speak with Chief DROLET at Northwood PD he will verify for us that she is a practicing witch.

DELFUOCO was asked to explain the post "Donald... dead, mother just lost it all, Diane sick, husband sick.... Next is WEAVER, ANDERSON, and GALLANT I will give you the shirt off my back and heal your diseases, but I am also just as capable of killing you off......don't ever cross me with corruption and greed." DELFUOCO explained that Donald is her Uncle, Diane her sister and her mother all crossed her during the custody hearings for her two kids, and so she put a curse on them. Her Uncle Donald died, her mother is down on her luck and her sister who she hasn't seen in sometime is now sick. DELFUOCO explained that she is a reiki master with the ability to heal. DELFUOCO again stated that she wouldn't actually kill someone but has the ability through her witchcraft to put a curse on someone that will cause them to become sick which will ultimately lead to their death.

DELFUOCO alleges that her sister DIANE and the GAL lied by stating she was a bad mother during the custody hearings.

DELFUOCO went on a rant about how she has had 7 back surgeries in 10 years, Judge WEAVER gave Jim GOAD custody of her now 17 year old son SPENCER who she isn't allowed to see, that Jim GOAD got a part time job at the store near her home where she often

| Page | 2 | of | 3 | pages | SIGNED | | DATE 2-23-17 |
|------|---|----|----|-------|--------|--|------|

**DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**
**CONTINUATION OF INVESTIGATION/ARREST REPORT**

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet DELFUOCO RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | February 9, 2017 |

shops at, that Jim GOAD put his mobile home on the market for $10,000 more than he bought it for, which is making it difficult for him to sell and pay off his loan.

DELFUOCO could not recall what day she posted the messages nor could she explain why the messages were no longer on her Facebook page. DELFUOCO did not know if she intended for anyone in particular to see her statements posted on Facebook.

DELFUOCO stated that James O'KEEFE, State Representative Kim RICE and State Senator Kevin AVARD are helping her with this issue.

DELFUOCO ended the conversation stating that she would not "physically" harm or kill someone but she is "very good at applying curses".

| Page 3 of 3 pages | SIGNED | DATE 2-23-17 |
|---|---|---|

001658

### DEPARTMENT OF JUSTICE
### OFFICE OF THE ATTORNEY GENERAL
### CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet Delfuoco RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | April 20, 2017 |

On Friday April 14, 2017 at approximately 1455 hours I received a phone call from Janet DELFUOCO who insisted that I write a letter to her stating that James GOAD sent me the copies of her February 5, 2017 Facebook postings when she posted about family members and the judges. I asked Janet DELFUOCO what makes her think that James GOAD sent the February 5, 2017 Facebook postings to me. Janet DELFUOCO responded because James GOAD used or planned to use copies of the same postings against her in court in their civil matter. Janet DELFUOCO was animated and loud I wasn't sure if she stated GOAD had provided the court with copies or planned to give the court copies of her February 5 Facebook postings.

Janet DELFUOCO insisted that her ex-husband is stalking her by viewing her Facebook page and making copies of her post to use against her. Janet DELFUOCO repeatedly insisted that I send her a letter stating that James GOAD sent us copies of her February 5, 2017 postings. I told Janet DELFUOCO no less than four times that it was not James GOAD. Janet DELFUOCO called me a liar and demanded I tell her who sent me the copies. I tried to explain to Janet DELFUOCO that this is an open investigation therefore I am not a liberty to tell her who sent us that information. I continued trying to assure her it was not her ex-husband James GOAD. Janet DELFUOCO continued to disbelieve me, stating that she had googled my name and read multiple times where I had lied and that I was a despicable person.

Janet DELFUOCO followed up by stating that if someone else is monitoring her Facebook page then "tell them to come face me, let's see what they are made of". Prior to hanging up on me, Janet DELFUOCO demanded that I send her a letter stating that I refused to investigate the bank fraud committed by her ex-husband.

Janet DELFUOCO called back a few minutes later ranting in a loud tone that instead of "babysitting" her I should investigate her ex-husband for bank fraud and the banking commissioner for attempting to assault her when he chased her out into the parking lot after she told the Commissioner, his attorney and Frank EDLEBLUT that she recorded their meeting. I reminded Janet DELFUOCO that the State Police opened an investigation reference that matter. Janet DELFUOCO stated that all they did was call her and tell her not to use that recording, which she stated that she chose to ignore after speaking with 5 different attorneys who told her it wasn't illegal to record a public meeting. I asked Janet DELFUOCO why she didn't tell the Trooper when he called her about the alleged attempted assault. Janet DELFUOCO yelled that this wasn't over, that I was a liar and corrupt like all the other state officials prior to her hanging up on me.

| Page | of | pages | SIGNED | DATE |
|---|---|---|---|---|
| 1 | 1 | | | 4·20·2017 |

DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
CONTINUATION OF INVESTIGATION/ARREST REPORT

| Matter # | Case Name | Investigator | Report Date |
|---|---|---|---|
| 2017123748 | State v. Janet DELFUOCO RSA 631:4-a - Harms or Threats to Certain Government Officials | Richard C. Tracy | February 15, 2018 |

On January 17, 2018, Rockingham County Superior Court notified us that Janet DELFUOCO, DOB 2/19/67 had been indicted on four counts of Harm or Threats to Certain Government Officials (RSA 631:4-a) and one count of Criminal Threatening (RSA 631:4). That same day I notified the Rockingham County Clerk, Maureen O'Neil, who in turn notified two of the victims, Judge Mark Weaver and Judge David Anderson of the indictments against Janet DELFUOCO. In addition I contacted Attorney Clifford Gallants office to notify him of the indictment.

The week of January 22, 2018, Attorney Erin Fitzgerald requested that I attempt to verify that Janet DELFUOCO was aware of the indictments and had not moved from her home at 259 Bow Street, Northwood, NH.

On January 24, 2018, I spoke with Wendy the administrative assistant at Northwood Police Department. Wendy stated that the PD is not aware of Janet DELFUOCO moving and they believe that Janet DELFUOCO continues to reside at 259 Bow Street, Northwood. That same day I checked Janet DELFUOCO's Facebook page where I observed recent photos posted on her Facebook page of Janet DELFUOCO'S home on Bow Street, Northwood.

On January 25, 2018, at approximately 1700 hours I checked Janet DELFUOCO's Facebook page where I located the following message that was posted the day prior.



Janet DELFUOCO
21 hrs

# Why do people have to be so evil and mean!! Karma people, karmaWhy do people have to be so evil and mean!! Karma people, karma

Top of Form

LikeShow more reactions
CommentShare
44 4

| Page | of | pages | SIGNED | DATE |
|---|---|---|---|---|
| 1 | 3 | | | 2-15-18 |

001660